UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 23-156 (SRN/TNL)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DESEAN JAMES SOLOMON (1) | ) | |
| a.k.a. Black | ) | **GOVERNMENT'S TRIAL** |
| LEONTAWAN LENTEZ HOLT (3) | ) | **BRIEF** |
| a.k.a. Shotta, a.k.a. Shot Dog, | ) | |
| a.k.a. Leon | ) | |
| MICHAEL ALLEN BURRELL (4) | ) | |
| a.k.a. Skitz | ) | |
| | ) | |

The United States of America by and through its attorneys, Andrew M. Luger, United States Attorney for the District of Minnesota, and Assistant United States Attorneys Esther Soria Mignanelli, Campbell Warner, and Kristian Weir, respectfully submits its trial brief in the above-captioned case.

## I.  <u>TRIAL COUNSEL.</u>

The United States will be represented by the following counsel:

> Assistant U.S. Attorney Esther Soria Mignanelli
> 300 South Fourth Street, Suite 600
> Minneapolis, MN 55415
> Desk: 612-664-5685
> Cell:  612-500-1884
> esther.mignanelli@usdoj.gov

Assistant U.S. Attorney Campbell Warner
300 South Fourth Street, Suite 600
Minneapolis, MN 55415
Desk: 612-664-5625
Cell:  612-807-0341
campbell.warner@usdoj.gov

Assistant U.S. Attorney Kristian Weir
300 South Fourth Street, Suite 600
Minneapolis, MN 55415
Desk: 612-253-0970
Cell:  651-802-5830
kristian.weir@usdoj.gov

## II.   INDICTMENT.

Defendant Desean James Solomon is charged by indictment with three felony offenses: Racketeer Influenced and Corrupt Organizations ("RICO") Conspiracy (Count 1) and Using and Carrying a Firearm in Relation to a Crime of Violence Resulting in Death (Counts 2 and 3). Defendant Michael Allen Burrell and Defendant Leontawan Lentez Holt are each charged by indictment with one felony offense in Counts 2 and 3, respectively.

## III.   SUMMARY OF THE EVIDENCE AT TRIAL.

The United States anticipates the evidence at trial will prove the following facts:

a.    *The Enterprise: The Minneapolis Bloods*

Since at least 2020, the Defendants have been members and associates of a violent criminal enterprise, the Bloods street gang (referenced here and in the Indictment as the "Minneapolis Bloods"). The Minneapolis Bloods have

2

"engaged in, among other things, acts of violence to include murder, assault, and robbery, as well as controlled substance distribution."  (ECF 1 at 2.) The Minneapolis Bloods has existed for several decades.  Its territory is in South Minneapolis, Minnesota, including and encompassing the neighborhood surrounding "George Floyd Square" ("the Square"), located at Chicago Avenue South and 38th Street East;



The Government anticipates one or more witnesses with prior or current affiliations/memberships within the Minneapolis Bloods (who are referenced throughout this trial brief interchangeably as a "Cooperating Defendant") will testify, in effect:

- The Bloods have two main sub-gangs, namely the Rollin' 30s Bloods and the Outlaw Bloods;

- The hierarchy of the Bloods includes a head or leader of the gang, senior leaders, street-level leaders, and other members or associates.  New recruits are called "YGs", who move up within the gang to "OYG" or original young gangster. The next level up is "OG" or original gangsters, who are well-respected members of the

gang. The highest level is "double OG." All OGs are equal in rank and can give out "shots" or orders. "Enforcers" carry out the OGs' "shots" or orders by beating or assaulting the offender;

• Members of the Bloods move up within the gang by "putting in the work," which essentially means to fight, shoot, sell drugs, or commit other crimes with members.

Members of the Minneapolis Bloods also display indicia of their membership through wearing red and using gang signs or terminology otherwise indicative of their membership in the Minneapolis Bloods.



Top:        Defendant Holt appeared in his brother's ("▬▬▬▬▬'s") rap video posted to YouTube on or about March 29, 2022, joined by other members and associates of the Bloods wearing only black, white, and red.

Bottom:     At a funeral for one member in or around September 2020, one member of the Minneapolis Bloods posted the following photo of attendees on his Facebook account.



Defendant Holt, in several different YouTube videos, repeatedly uses his hands to form a "b." In a YouTube video filmed by another member of the Bloods (featuring the same alleyway nearby the Square as was featured in Defendant Holt's and his brother's video), Defendant Holt appears in the background throwing the same sign, while others use three fingers to throw a gang sign meaning "Blood love."

 

Left:   Defendant Holt is joined by his brother and two other younger associates of the Bloods, among others, in his video entitled, "Lil Message," posted on YouTube on March 29, 2022.

Right:  Defendant Holt appears on the far right-hand-side toward the end of a video created by another member of the Bloods.

Members of the Bloods also display or express their affiliation with the gang by replacing the "c" in words with a "b" or by starting words with a "b", and by referencing the Rolling 30s with "30s" or "30z." The replacement of the "c" with a "b" is an acknowledgement of the longstanding rivalry between the Minneapolis Bloods and an opposition gang, the Crips.

1.   *Operations of the Enterprise and Defendants' Agreement: Shared Firearms and Violent Pursuits*

Members of the Minneapolis Bloods share common purposes, which

include committing crimes of violence to promote and enhance the reputation of the Minneapolis Bloods and to keep rival gang members in fear of the gang; and enriching leaders, members, and associates through the trafficking of controlled substances. The Defendants have all been involved in the operations of the Minneapolis Bloods for years, and they share in these purposes of the enterprise.

          i.     *June 15, 2019, Shootout and Homicide*

On June 15, 2019, Defendants Holt and Solomon were at a party in a building on Kennedy Street in Northeast Minneapolis. Defendant Solomon arrived and left this party in a white Camaro that is missing its front license plate. Several other members of the Minneapolis Bloods, including John Solomon, Dante Tyus, and ███████████████[1] were present for this gathering. After a fight broke out inside the Kennedy Street building, attendees went outside and started shooting at one another in and around the parking lot. The shootout started around 4:30 a.m. At 4:44 a.m., a 911 caller called in the commotion, thinking it might be fireworks, and stated that there was a lot of "yelling" and cars circling back and forth around where the shootout occurred. One witness (███████████) was at the party and was the driver of a Jeep SUV that was observed in surveillance footage at the scene of

---

[1] The Government anticipates a Cooperating Defendant will identify each of these individuals as members or associates of the Minneapolis Bloods.

the shootout. Surveillance footage also shows Bloods member ██████████ ████ and several other men, including ██████████, piling into a Jeep SUV when fleeing the scene of the shootout.

████ is anticipated to testify that a man, who goes by the nickname "████," directed her in what direction to flee the scene of the shootout and told her where exactly to drop off him and ██████████. A Cooperating Defendant will identify "████" as a nickname for ██████████, a member of the Minneapolis Bloods. At least one other witness from the party is anticipated to testify Defendant Holt (sometimes referred to as "Lil Blood"), Defendant Solomon (referred to as "Black"), and "████" were all at the party and are known to be Bloods. ██████████, on the other hand was known to be a member or associate of a northside Minneapolis gang, and was also at the party.

████ dropped off ██████████ and ██████████ near where Clinton Avenue dead-ends at East 37th Street in South Minneapolis—in Bloods territory. She drove only a couple block away before stopping to urinate in a bush; while doing so, she heard 5-10 shots coming from the area where she had just dropped off ██████████ and ██████████. Out of fear, and at the direction of some of the remaining individuals in her vehicle, she quickly fled the scene thereafter. At 5:28 a.m., Minneapolis Police Department ("MPD") Officer Lucas Oachs was the first to respond to the shot spotter

activation that emanated from the area. When he arrived, he found ███ ███'s dead body on the north sidewalk of 37th Street, just west of Clinton Avenue South. Officer Oachs is anticipated to testify that, based on his years of experience in MPD's Third Precinct, he knows that intersection to be a common Bloods hangout. When he arrived, Officer Oachs counted five bullet wounds in ███'s torso area.

Minneapolis Police Department Forensic Scientist Aaron Zirzow examined the discharged cartridge casings ("DCCs") found near Mr. Creamer's body on 37th Street and concluded they were fired from one of the guns used in the shootout outside of the building on Kennedy Street less than one hour earlier.

At approximately 8:00 p.m. on June 15, 2019, another member of the Bloods, ███ (or "███"),[2] placed a call from a Department of Corrections facility to Defendant Holt, who informed Robinson that the neighborhood "was hot [had a heavy police presence]" at that time. In April 2021, Defendant Holt pleaded guilty to illegally possessing a firearm on June 15, 2019.

---

[2] Robinson was convicted of First-Degree Murder in Hennepin County District Court case number 27-CR-20-15214 for the shooting and killing of his pregnant girlfriend nearby the Square in 2021. While the fact of his present incarceration will be referenced at trial, the nature of his conviction and the underlying facts that led to his murder conviction will not be offered into evidence by the Government.

  ii.  *December 7 and 8, 2019, Shootings in Downtown Minneapolis and Defendant Solomon's White Camaro*

Later in 2019, some witnesses began providing information to law enforcement officers about the Shootout on Kennedy Street and the related homicide. Specifically, around October 2019, several members of law enforcement spoke with one witness, ██████████, who was interviewed about the events of June 15, 2019, after being charged with one of the guns used at the Kennedy Street shootout.

In the early morning hours of December 8, 2019, the mother of one of Mr. ██████'s children, ██████████████, was at Augie's (a downtown gentlemen's club and common Bloods hangout) with her cousin, ██████████. After they left the club, and while she was seated in the front passenger's seat of Mr. ██████'s vehicle that was driving through downtown Minneapolis, she was shot by the driver of a white Camaro. Augie's surveillance footage depicts a white Camaro (with a missing front license plate and chrome mirror-covers affixed to the side rearview mirrors) leaving the area of Augie's at approximately 2:22 a.m. on December 8, 2019, driving down Hennepin Avenue, in the direction toward South 8th Street.



Footage from Minneapolis Public Housing Authority depicts a white Camaro approaching a dark vehicle (that looks like Mr. ████'s) on South 8th Street at approximately 2:30 a.m.



Officers would later collect DCCs on this street, a little further east from where this footage is captured.

Mr. ████ flagged down the first responding officer several minutes later, after he first continued driving south on Hiawatha Avenue to Lake

Street.[3] According to Mr. ███, the shooter drove by them and shot at his vehicle while they were driving down South 8th Street; the shooter was the driver of a white Camaro; he had seen the driver of that white Camaro earlier inside Augie's (and later learned his name to be "Black"); he saw Black flashing a "b" hand sign in the club and hanging out with a man named "███", who Mr. ███ knows to be a Blood; Mr. ███ feared speaking with law enforcement, because he believed his cousin was shot because of her connection to someone else who provided information to law enforcement against members of the Bloods.[4]

A review of Defendant Solomon's historical cell site location data shows Mr. Solomon's cell phone traveled from downtown (near Hennepin Avenue and south of Augie's around 2:24 a.m.) to south Minneapolis (just west of the Square around 2:37 a.m.) on December 8, 2019.

The night before this drive-by shooting, Defendant Solomon and several other Bloods were at Augie's. The front-entrance surveillance footage from Augie's in the early-morning hours of December 7, 2019, shows Bloods members entering the club at the same time as ███ (including ███

---

[3] The body-worn camera footage of the first responding officer, MPD officer Ryan Atkinson, has been excerpted to exclude the shooting victim's reference to her children and the fact of her pregnancy at the time.

[4] A Cooperating Defendant's testimony, along with Defendant Solomon's own financial records and communications, will be offered to prove Defendant Solomon uses the nickname "Black."

██ and Dante Tyus).[5]



At 1:52 a.m., Milestone footage depicts Defendant Solomon and another member of the Bloods (████████) walking to a parking lot and then returning to wait outside Augie's (an establishment equipped with a metal detector). Shortly after 2:00 a.m., Defendant Solomon (who is observed on Augie's exterior surveillance footage standing outside Augie's with ████) texted ██████, "we outside kum on." Soon after, ██████ walks outside, rubs shoulders with ████, then immediately raises his arm to fire a gun at ████████████.

Immediately after shots are fired, Defendant Solomon is captured on an officer's body-worn camera footage, and then surveillance footage shows a white Camaro pulling out of the parking lot that Defendant Solomon had been

---

[5] A Cooperating Defendant's identification of Tyus and Black as members or associates of the Minneapolis Bloods will also be corroborated by recorded jail calls and social media posts or messages.

walking toward. After this shooting, ████████ texted Defendant Solomon a video where members of another gang appear to be talking about a shooting that just happened outside Augie's. Defendant Solomon replied, "lmao [laughing my ass off]."

Based on officers' observations of video surveillance and the use of Defendant Solomon's white Camaro following a shooting, officers searched that white Camaro on December 16, 2019. Officers observed chrome covers affixed to the side rear-view mirrors, a license plate on the floor of the front passenger's seat, and a DOC visit photograph featuring Defendant Solomon with other Bloods members, including ████████.[6]

Defendant Solomon was also stopped in this white Camaro on at least two other occasions: (1) on December 3, 2018, officers found him in the white Camaro with one other individual and a .40 caliber Glock semi-automatic pistol under his seat (he initially stated the car was his girlfriend's, whose name it is registered under, and provided a false name); (2) on August 6, 2019, officers found him in a white Camaro (this time with a changed license plate).[7]

---

[6] The United States anticipates a Cooperating Defendant will identify ████████ as a member of the Bloods who is currently serving a state sentence. His specific prior criminal convictions (which includes a murder conviction) will not be referenced.

[7] Although Defendant Solomon was the only one in the car at this time with a .40 caliber Smith & Wesson semi-automatic pistol, the gun and Defendant Solomon's statements from this stop will not be offered into evidence.

   iii.   *May 2, 2020, Arrest of Defendants Holt and Solomon from a Vehicle Used in an April 2020 Shooting and Containing One of the Guns Used for the April 2020 Shootings*

On May 2, 2020, Officers stopped a black Chevrolet Tahoe that had been reported was used the week before in a shooting near Franklin Avenue and Chicago Avenue in South Minneapolis (a Cooperating Defendant will testify this intersection is not in Bloods territory but is a rival gang's claimed territory). When instructed to exit the black Tahoe on May 2, 2020, Defendant Solomon came out of the driver's seat and Defendant Holt came out of the front passenger's side. Under the front passenger's seat, officers found a 9mm FN Herstal semi-automatic pistol.

On May 2, 2020, Defendant Solomon, while seated in the back of a squad car asked officers what he was being arrested for. When he was informed officers found the gun, he asked if Defendant Holt was also being arrested. When he was told yes, Defendant Solomon questioned, in a heightened pitch, "for the same gun?... *'da fuuuck*?!"

On May 4, 2020, during a post-*Miranda* interview, Defendant Holt told officers that his mother bought the black Tahoe the month before. At the end of his interview, while the officer was executing a buccal swab warrant for Holt's DNA, Defendant Holt said he wanted to "take [his] statement back."

A test-fired round from the FN Herstal found in the black Tahoe was

compared to 9mm DCCs from that occurred the week prior involving a black Tahoe, and a forensic scientist concluded they were fired from the same gun. With respect to that shooting, on April 27, 2020, at approximately 3:09 p.m., two guns were used to shoot at a Blue BMW traveling on Franklin Avenue. A victim occupant of the Blue BMW is anticipated to testify that when the BMW was passing the Black Tahoe, two windows on the passenger's side of the Black Tahoe were rolled down and shots started to hit the Blue BMW.[8] Officers collected four .45 caliber DCCs and seven 9mm caliber DCCs from Franklin Avenue near where witnesses reported the shots were fired.

        iv.     *May 12, 2020 Arrest of* ▮▮▮▮ *from a Vehicle Containing a Gun Used in both the April 2020 and December 8, 2019 Shootings*

Ten days after Defendants Holt and Solomon were arrested from the vehicle containing the 9mm used in the April 2020 shooting, ▮▮▮▮ was arrested from a vehicle containing the .45 caliber used in the April 2020 shooting on Franklin Avenue. Specifically, officers were executing an arrest warrant (issued in connection with the December 7, 2019, shooting outside of Augie's) for ▮▮▮▮ nearby a residence he was staying at in St. Paul at the

---

[8] One occupant of the Blue BMW was shot. Officers found the Blue BMW and victim occupants at HCMC. The extent of the gunshot victim's wounds will not be offered into the evidence. The United States intends to offer only a victim's testimony (a person who was not shot), photographs depicting the bullet damage to the Blue BWM, Milestone footage placing the two vehicles at the location of the shooting, and the DCCs collected from Franklin Avenue to prove the facts necessary related to this shooting.

time. In his vehicle, officers found a Springfield Armory semi-automatic pistol, model XD, caliber .45 ACP. A forensic scientist analyzed a round test-fired from this gun and concluded the .45 caliber DCCs from both the December 8, 2019, shooting (involving the white Camaro) and the test-fired DCC were fired from the same gun. Likewise, the DCCs from the December 8, 2019, shooting and from the April 2020 shooting (involving the black Tahoe) were fired from the same gun.

The above progression of shootings and firearm recoveries (summarized in the below table) confirm Defendant Holt and Defendant Solomon's knowing agreement to join the Enterprise and corroborate what a Cooperating Defendant will testify is one benefit to membership in the Enterprise: access to and the trading and sharing of firearms.

> v. *January 5, 2020 Arrest of Defendant Burrell from a Vehicle Containing a Gun and Drugs in Bloods Territory*

On January 5, 2020, officers responded to a call of a suspicious vehicle parked with the ignition turned on and lights off in the middle of a street in at approximately 7:00 a.m. When officers arrived, they saw Defendant Burrell asleep at the wheel and a 9mm Glock semi-automatic pistol on the front passenger seat. On Defendant Burrell's person, officers found a live 9mm cartridge, over $300 cash, and a baggie of suspected narcotics. In his car, officers found two additional baggies of suspected narcotics and two digital

16

scales. Burrell had been asleep at the wheel near 4th Avenue South and 42nd Street East, near the southern edge of Bloods territory.

2.      *Operations of the Enterprise: Obstruction of Justice*

As discussed in part above, the Minneapolis Bloods keep victims and witnesses in fear of the Enterprise through threats of violence and actual violence. This dovetails with their steps regularly taken to prevent law enforcement's detection of the criminal activities of the Enterprise. One way the Enterprise operates to avoid law enforcement detection is by forbidding members and associates from cooperating with law enforcement. A Cooperating Defendant will testify that speaking with law enforcement (and testifying at a trial like this one) is to commit one of the gravest "violations" against the Minneapolis Bloods—risking retaliation up to and including risking being shot at or murdered by members of the Enterprise.

As another example of the obstructive efforts of the Enterprise, one member (███████████ a.k.a. ███████" a.k.a. "███████ created and posted a YouTube video entitled "MN v. YG" describing in detail how he was acquitted of a double-murder charge stemming from an August 6, 2015, shooting near Peavy Park (north of Bloods territory, nearby where the black Tahoe April 27, 2020 shooting occurred). His rap states, in part:

> *I'm facing two murder charges and four attempts. . .*
>
> *I can't believe they took the stand; they looked at the*

> *prosecutor, raised they right hand; they swore to tell the*
> *truth, then they ratted on me man; [witness' name] said*
> *I seen Popeye with a gun in his hand. . .*
>
> *I put my murder game down but I play the patience;*
> *and I don't typically make mistakes with identification;*
> *Because I point at both hands and I point at faces; but*
> *tell me when da' fuck gangsters start making*
> *statements?! . . .*
>
> *I'm a suspect, but never will I be a witness. . .*

The images below are from the video for "MN v. YG", originally posted to YouTube in August 2018, and depict a news headline and multiple excerpts from Jenkins' dicsovery related to witness statements.

  

A Cooperating Defendant will testify that it is common for members of the Enterprise to share or obtain "paper" or "paperwork" for pending cases related to charges pending against members or associates of the Minneapolis Bloods (and this is ordinarily one benefit to membership). "Paperwork" or "paper" is the term members of the Minneapolis Bloods use for discovery or copies of statements in criminal cases.

For example, on August 12, 2018, Defendant Solomon, using his

Minnesota Department of Corrections Jpay (messaging) account,[9] sent an in-custody member of the Bloods a message. Defendant Solomon was out of custody at the time.  The message contained photographs of the transcript of an interview that inmate recently had with police officers.  The message stated "N**** u 12 and I read tha paper." Law enforcement officers involved in this investigation and a Cooperating Defendant will testify that "12" is commonly used to reference the police, and therefore, accusing someone of being "12" is the equivalent of an accusation that they are cooperating with law enforcement. The next day, Defendant Solomon sent a copy of the inmate's own statement back to that inmate, likely to further intimidate that inmate against further cooperation.

The inmate responded by imploring Solomon to contact the inmate's attorney and providing the name and number for the inmate's defense attorney. *Id.* Specifically, on August 15, 2018, the inmate, understanding the nature of Solomon's threat, pleaded: "you can call [my attorney] and ask whatever you want about my case and any statements [sic] made in the case." *Id.*

---

[9] Defendant Solomon's JPay account used for this exchange, "king black", is attributed to him, in part, by this account's use of the same email address as used for Defendant Solomon's US Bank account.

The government also intends to offer a letter to Bloods member ███████████████████ (a.k.a. "███████████") from his brother, ████████ ███████████, another Bloods member. In the letter, ████████████████ discusses how he concocted a plan to have another individual make false claims on a recorded jail call that provided ██████████ with a defense in a pending murder case; ██████████ eventually pleaded to an amended count of first-degree manslaughter (heat of passion).

The government will also offer evidence of Defendant Solomon's prior conviction for witness tampering (Hennepin Co. file no. 27-CR-14-18643). This evidence will include a witness who reviewed Solomon's recorded jail conversations with another Bloods member in which he discusses bribing the victim of his other pending criminal case. Defendant Solomon specifically told an associate he called "Bird" to have someone "talk to the girl who was driving that car they said I stole" and if she agreed to drop the charges, "motherfuckers will give her a couple dollars." Jordan Edwards is a known member of the Bloods who goes by the nickname "Bird" or "J-Bird." Defendant Solomon had another call with other associates in which he again instructed them to tell the victim to "drop that shit" and there would be "some bread for her." Defendant

Solomon continued, "[s]omebody need to do that bitch ASAP" and that they needed to "make sure everybody do what they supposed to do." In later calls, Defendant Solomon learned that the victim wanted $400 to drop her charges. Defendant Solomon asked "$400? . . . to drop it?" When told yes, he responded "Yeah, but tell her she has to drop that shit, though." In one last call, Defendant Solomon told the same associate to give the victim even more money ($600-$700), and to "do it ASAP ASAP." The witness will also testify that the victim in that pending case then refused to appear to testify at trial, leading to the charges being dismissed.

Finally, as recently as May 13, 2023, Defendant Solomon told a third party that he instructed his attorney to "just fight everything" the government is doing. *See* GEX 32.[10]

### 3. *Continuity of the Enterprise: History of the Bloods*

There are Bloods chapters actively operating in cities across the country. The Minneapolis Bloods dates back several decades, with an original connection to the even-older Bloods of Los Angeles. The Minneapolis Bloods are not currently structurally connected to the Bloods in Los Angeles. There also remain other Bloods in and around the Twin Cities, like the Piru (from California) and the Hilltops (from St. Paul) that the Minneapolis Bloods are

---

[10] This jail call, along with all others the Government anticipates moving into evidence (and further discussed below in Sections IV.c. and IV.e), will be provided to the Court contemporaneous to this filing.

not structurally connected to—and are sometimes in conflict with.

After the Rolling 30s subsection of the Minneapolis Bloods was formed, the Outlaw Bloods were also formed. As set forth below, and as will be described at trial by one or more Cooperating Defendants, the criminal activities of the Minneapolis Bloods precede the acts of racketeering enumerated in the Indictment by years.

4.     *Continuity of the Enterprise: Presence Around the Square*

Following the unrest in Minneapolis after the murder of George Floyd on May 25, 2020, certain community organizers and activists erected barricades and closed the intersection at the Square to vehicle traffic.  Community organizers and activists referred to the Square as "autonomous," "no-go," and "police-free."

In response, the City of Minneapolis Office of Violence Prevention ("OVP") implemented a pilot of the MinneapolUS Violence Interruption Network ("MinneapolUS VIN"). According to one member of the mayor's safety committee advisory board, MinneapolUS VIN was based on the violence interruption model from larger cities, like Chicago. The model utilizes former gang leaders who have "turned their life around" to become "violence interrupters" and "credible voices" in the community. The forerunners of the Chicago model were flown from Chicago to Minneapolis to hold training in the summer of 2020.

Around this time, individuals a Cooperating Defendant will identify as members, associates, and leaders of the Minneapolis Bloods helped to form The Agape Movement Co. LLC ("Agape").

According to a representative of a South Minneapolis non-profit community organization ("Organization 1"), Organization 1 was approached by a representative of the City of Minneapolis ("the City") in or around the summer of 2020 and asked to be the fiscal agent to facilitate a contract between Agape and the City for violence interruption and community outreach work in furtherance of the MinneapolUS VIN Pilot program. This fiscal relationship lasted through April 2022; between 2020 and 2022, Organization 1 operated as a conduit of payment between the City of Minneapolis and Agape. A representative from Organization 1 is anticipated to testify that Agape and Organization 1 had conflicting organizational values, because Agape only cared about "presence in the Square" whereas Organization 1 existed to serve all communities within South Minneapolis.

During this time, according to bank and check records, Agape also paid tens of thousands of dollars to members of the Minneapolis Bloods, including Defendant Solomon and ██████, with the funds from the contract with the City for violence interruption and community outreach work.

As alleged in the Indictment, no later than in or about 2020, members of the Bloods controlled territory in and around the Square and controlled the

drug trafficking that occurred there.

    b.    *Alleged Overt Acts: Violence*

        1.    *June 14, 2020 Bar Fight with Victim 1, Shootout, and Murder of Victim 2*

On June 14, 2020, Defendants Solomon and Burrell, and other Bloods members went to the 200 Club, a nightclub in North Minneapolis, where they first assaulted ▆▆▆▆▆▆▆ ("Victim 1") in the men's restroom and then murdered ▆▆▆▆▆ ("Victim 2") during the shootout that followed outside because of this assault in the men's restroom.

Interior surveillance footage from the 200 Club shows ▆▆▆ (a member of the Family Mob gang) entering the men's restroom—which has a door that swings open. Shortly after ▆▆▆ entered, the door starts swinging open, because of an apparent struggle inside that restroom. At one point, ▆▆▆ appears briefly to start to step out of the restroom, only to be dragged by his blue shirt back into the restroom.



After ███ finally breaks away from the assault in the men's restroom, Defendant Solomon, Defendant Burrell, and ███ are the next three individuals to exit that restroom.

Following the initial assault, both Defendant Solomon and ███ appear on interior surveillance footage pacing around and speaking with others in the 200 Club. At several points in the interior footage, Defendant Solomon appears to have a weighted bulge shaped like a gun in his front hoodie pocket:



As Solomon and ███ appear to direct people inside the bar, surveillance shows Defendant walking out of the bar, heading north on 2nd Street. He encounters ███, causing him to run back to the 200 Club parking lot, where he hides behind a black SUV next to the exterior corner of the bar. As ███ and another man walk south on 2nd Street toward the 200

Club entrance, Defendant Burrell opened fire from his concealed location. Based on the timing of the shots fired as observed in exterior surveillance footage, Defendant Burrell fired the first shot (in the direction of █████ and a man walking with █████) while in the parking lot adjacent to the 200 Club. The man walking with █████ returns fire shortly thereafter from the street next to the sidewalk they were walking down. In the corner of the parking lot area where Defendant Burrell's muzzle flashes were observed, a group of nine 9mm DCCs were recovered by officers: all were determined to have been fired by the same gun.

Moments later, Defendant Solomon and █████ are on interior surveillance running out of the club together, holding their arms in their pockets. Outdoor surveillance footage then shows Defendant Solomon and █████ paused at the corner nearby where Hodge fled Defendant Burrell's shots, and within seconds of them briefly stopping at that corner, multiple muzzle flashes emit from Defendant Solomon's firearm (pointed in the direction where █████ fled) before Defendant Solomon and Robinson turned around to start running in the direction of their vehicle.



The surveillance camera across the street also captured footage of Defendant Burrell, Defendant Solomon, and ███████ all hopping into the same dark sedan, parked on the west side of 2nd Street, a block north of the 200 Club. A red Tahoe then approaches from the south, and Defendant Solomon exits the passenger door and stands next to the sedan. After the red Tahoe passed them (driving northbound), several muzzle flashes again emit from Defendant Solomon's extended arm (pointed in the direction of travel of the red Tahoe). The DCCs collected from this area of the street matched those collected from the other area where surveillance shows Defendant Solomon firing his gun. After this, ██████ and Defendant Solomon get back in the sedan and they drive away from the scene with Defendant Burrell.

The red Tahoe arrived at the Hennepin County Medical Center minutes later, carrying ████ in the front passenger's seat, who was soon thereafter

pronounced dead. The Hennepin County Medical Examiner determined the cause of death was a bullet that entered through the back of Victim 2's head:



Photographs taken of the red Tahoe also show that the bullets entered the vehicle through the back (consistent with the direction from which Defendant Solomon appeared to be firing from the street) and a significant amount of bleeding was left behind on the headrest (and flowing in a downward direction) in the front passenger's seat:

 

After Defendant Burrell's initial shots were fired outside the 200 Club, shots were exchanged between Minneapolis Bloods and others over a span of several minutes. Officers responding to the scene collected over 100 DCCs from the area. The hospital received six gunshot victims that night—including ███ and Defendant Burrell, who sustained a bullet wound to the buttocks. Defendant Burrell left the hospital early, against medical advice, and was captured on surveillance footage walking out with his telemetry device still attached to his body:



A BCA Forensic Scientist compared DNA from a known sample taken from Defendant Burrell and against the DNA collected from the nine DCCs recovered from the corner of the parking lot where video footage shows muzzle flashes emitting nearby Defendant Burrell. The Forensic Scientist determined that the DNA from the DCCs represented a mixture from two or more

individuals. The partial major male DNA profile matches Defendant Burrell's DNA profile. A major male DNA profile would not be expected to occur more than once among unrelated individuals in the world population.

Hodge is historically associated with an opposition gang known as Family Mob and has more recently been associated with the Highs street gang. The Highs consist of multiple documented gangs, which are sects of the Highs. Years before this shootout and murder, ▮▮▮▮ also testified in a trial that led to the conviction of Defendant Burrell's younger brother, also a member of the Minneapolis Bloods.

The United States anticipates several witnesses will identify Defendant Burrell and Defendant Solomon in the video footage partially described above. At least one witness will testify that ▮▮▮▮ came to the bar with, or was otherwise associated with, ▮▮▮▮

A Cooperating Defendant will further testify that when a member of the Minneapolis Bloods is disrespected, other members are expected to retaliate. Members of the Minneapolis Bloods—especially those who fill a "shooter" role in the gang—will shoot rival gang members or individuals who disrespected someone in the gang, or the gang itself. And when they shoot, they shoot to kill. Finally, when shootings break out with opposition gangs, Bloods members within proximity are expected to come to each other's aid, up to and including by firing their own weapons at opposition gang members.

2.     *April 23, 2022, Bar Fight with Victim 3 and Murder of Victim 4*

On April 23, 2022, Defendants Solomon and Holt, and other Bloods members, went to Williams Pub, a bar in the Uptown Neighborhood of South Minneapolis, where they were celebrating a birthday. Surveillance footage from the front of the bar depicts Defendants Holt and Solomon arriving at the same time—Defendant Holt wearing a red letterman-style jacket and Defendant Solomon in a white t-shirt and track pants.



While inside the Pub, a member of the Tre Tre Crips gang, ▮▮▮▮▮▮▮▮ ("Victim 3") approached and began to speak with another Bloods member ▮▮▮▮▮▮▮▮▮▮). While ▮▮▮▮▮ and ▮▮▮▮▮▮ spoke, ▮▮▮▮▮ put his hands up, as if to express he was not looking for a fight. Nonetheless, ▮▮▮▮ was

circled by members of the Minneapolis Bloods, as depicted by the interior Pub

surveillance footage:



Defendant Solomon is standing directly across from ███████ to ███████'s left and in front of Defendant Holt. Behind ███████ is John Solomon and to Defendant Solomon's left if a juvenile member of the Bloods in a white hoodie (who is depicted in the later-in-time footage described below firing a firearm toward ███████████ ("Victim 4") right after Defendant Holt shot ███████).

In the moment depicted above, █████████ has his hands up. Moments later,

Defendant Holt is captured in this footage swinging the first punch and hitting

█████████ in the face. The rest of the Bloods members in their circle (except

█████████) collectively assault █████████, and a large bar fight ensued:



After several minutes, Defendants Holt and Solomon and others left the bar. Defendant Holt is seen on Milestone footage walking toward his car (a Dodge Charger parked on Lagoon Avenue), and just a minute later, crossing the street on Lagoon Avenue to link up with Defendant Solomon, the juvenile member of the Bloods, John Solomon, and ██████████. These Bloods members first start walking together eastbound on Lagoon Avenue, with Defendant Solomon at the front of their line and Defendant Holt near the rear, next to the juvenile member of the Bloods. While walking in this direction, the juvenile Bloods member can be seen on surveillance footage receiving a gun from Defendant Holt, walking on the juvenile's left side.



After exiting the above camera's view for a few moments, this group turns around to walk westbound on Lagoon Avenue (this time with Defendant Holt in the lead). At this time, ██████████ ("Victim 4"), walked west toward the group of Bloods. ██████ was also associated with the Tre Tre Crips and was in the Pub with ██████ before the bar fight broke out. As ██████ got close to the group of Bloods walking in the opposite direction, Defendant Holt pulled a pistol from his pocket and fired at ██████ at close range.



██████ fired back with his own pistol and ran away eastbound down Lagoon Avenue.  The juvenile member of the Bloods fired his pistol toward ██████ as ██████ ran away (and in a manner appearing to provide the other Bloods members cover as they fled in the opposite direction).  ██████ collapsed a short distance later and died on scene.

After the shooting, Defendant Holt and the juvenile co-conspirator ran into Defendant Holt's Dodge Charger that was parked on Lagoon Avenue. Police chased the car, but when they caught up to it, Defendant Holt and the juvenile co-conspirator had already fled. Police found a Kimber .45 caliber semiautomatic pistol on the backseat. They also found Defendant Holt's VISA card and other paperwork with Defendant Holt's name on it.

Officers recovered .45 caliber, .40 caliber, and 9mm DCCs from the murder scene. Police recovered a loaded 9mm pistol from ███'s body. A forensic scientist's comparison showed the .45 caliber casings were consistent with being fired from the Kimber .45 pistol that was recovered from Defendant Holt's Charger. The medical examiner recovered two bullets from ███'s body; the forensic scientist determined one of those bullets was consistent with having been fired from a .40 caliber pistol. At the time of this filing, Defendant Holt's .40 caliber pistol used in the murder of ███ has not been recovered.

The United States anticipates multiple witnesses will testify that, in June 2016, ███ previously stabbed a member of the Minneapolis Bloods, ██████ (or "███"), outside of Augie's. In the early morning hours, ███ and another member of the Tre Tre Crips approached women outside the club and started speaking with them. One man, who ███ interpreted to be a boyfriend of one of the women, took a fighting stance and then called "SOOOO WHOOOO!"[11] Moments later, several other men (who ███ and his associate recognized as Bloods) surrounded them and started fighting them. During this fight, ███ used his knife to stab ██████. (or "███"). ███ was then convicted of Second-Degree Assault in Hennepin

---

[11] According to a Cooperating Defendant, this is a call used by members of the Minneapolis Bloods. When one Blood makes this call, Bloods come running from wherever they are located to see what is going on and to provide support. If an opposition gang member made this call, it would be in a mocking way.

County and had recently been released from DOC custody when he showed up at Williams Pub on April 23, 2022.

A Cooperating Defendant is anticipated to testify that other Bloods are expected to retaliate when one member is stabbed or assaulted. In addition, women cannot typically be members of the Minneapolis Bloods. While some women are deeply respected within the gang because of their ties to an important Bloods family, most are viewed as the "business" of the Bloods member who they may be in a relationship with. One way to "disrespect" a member of the Minneapolis Bloods is to hit on a woman that that member claims as his.

      c.    *Alleged Overt Acts: Drug Trafficking*

Another purpose of the Minneapolis Bloods is to enrich the leaders, members, and associates through, among other things, illegal trafficking and distribution of controlled substances. Following the murder of George Floyd, and into 2022, the Bloods' presence around the Square was strengthened—and members directly benefitted from the protection of the Enterprise while distributing controlled substances.

Between July 2021 and February 2022, agents with the Federal Bureau of Investigation ("FBI") worked with Confidential Reliable Informants ("CRIs") to complete a series of purchases of narcotics ("controlled buys") from Bloods members at the Square. For each controlled buy, the CRI met with FBI agents

at a pre-determined location and was searched (to confirm the CRI did not have any drugs or weapons) and was equipped with a recording device. The CRI then met up with the Bloods member the CRI previously arranged to purchase narcotics from at the Square. After completing the sale, the CRI returned to the pre-determined location to meet with agents, and hand over the drugs and recording device that just captured the sale.

On July 16, 2021, co-defendant Jamaal Rice had agreed to sell the FBI CRI fentanyl.  Co-defendant Rice and another member of the Bloods, Jordan Edwards, met with the CRI near the Square and sold the CRI 40 pills.

On August 6, 2021, co-defendant Rice sold an additional 16 pills to the CRI near the Square. On December 14, 2021, co-defendant Jamaal Rice, with the aid of co-defendant Andrew Noble, sold an additional 205 pills to the CRI near the Square. On February 25, 2022, co-defendant Jamaal Rice sold an additional 52 pills to the CRI near the Square. Each of these transactions were video-recorded by the CRI.

A Cooperating Defendant is anticipated to testify that Bloods members often sell fentanyl pills and other narcotics at the Square and can rely on the protection of other Bloods members there. Proceeds from narcotics transactions are used to purchase firearms and drugs, which are then distributed among Bloods members, or used to buy more drugs.  Bloods members gain respect and stature in the gang by making more money.

d.   *Alleged Overt Acts: Obstruction of this Federal Investigation*

On March 15, 2023, agents and an Assistant United States Attorney interviewed ███████ in prison. ███████ was not informed ahead of time that law enforcement was coming to visit him, or the nature of the interview. During this interview, ███████ was asked briefly about the shooting outside Augie's on December 7, 2019 and the murder outside of the 200 Club on June 14, 2020. ███████ was informed generally that there is an ongoing federal investigation of the Bloods street gang, and that he was viewed as a witness at the time. During the interview, law enforcement served ███████ with a Grand Jury subpoena for his testimony on March 21, 2023.

In the hours following the interview, ███████ made multiple incriminating recorded calls from prison (most of these calls were placed using the telephone PIN of another inmate). During these calls, ███████ told Dante Tyus the following: (1) the "feds" came and talked to him, (2) there is an indictment coming for the Bloods, (3) there is Grand Jury scheduled for March 21, 2023, and that (4) ███████ wanted to "fuck up" this investigation. ███████ also instructed Tyus to post this information to ███████ s Snapchat and Facebook accounts.

For example, on March 15, 2023, at approximately 4:48 p.m., ███████ stated to Tyus, "Listen Blood, the.. the…them people just came and hollered at me Blood." Tyus asked, "Who?" ███████ responded, "Uh…them FBI people

39

n\*\*\*\*. . . The United States Attorney just slid on me and said n\*\*\*\* it's an indictment going through the hood and they. . . they calling a grand jury on the 21st which is Tuesday. So if you…tell them n\*\*\*\*\*….fuck it.  You…can you post for me?  On my mother fucking shit [social media]?" Later during the same call, ▇▇▇▇ stated, "So that's giving you all n\*\*\*\*\* time to cease whatever the fuck they trying to say n\*\*\*\*\* is doing or give n\*\*\*\*\* a chance to go to New York or California, you know what I'm saying?  I'm fucking up they invest…they investigation. On Bloods, let them n\*\*\*\*\* know.  On Bloods . . . N\*\*\*\*\* on the story and a Snap n\*\*\*\* on Bloods . . . On Bloods, put that on a Snap and on the Facebook.  On Bloods n\*\*\*\*." In later calls on March 15 and March 16, 2023, ▇▇▇▇ asked Tyus to confirm that Tyus posted this information for ▇▇▇▇ on both Facebook and Snapchat.

In one call with a girlfriend, ▇▇▇▇ stated, "But I know they BS-ing though about me not being in the indictment." His girlfriend asked, "You think you in it?" ▇▇▇▇ replied, "I know I am. You can't indict, how can you indict everybody without indicting me? . . ."

A Cooperating Defendant will testify that members of the Bloods are prohibited from speaking with law enforcement and that a member's violation of that rule justifies violent retaliation. ▇▇▇▇'s recorded calls corroborate this point. In one call, he appears to consider the consequences of testifying truthfully in this investigation: "They like, we. . . if you worrying about being

in paperwork, we can protect you. I'm like I'm not worried about being protected. If I make a statement. I'm going to have to deal with whatever comes. Fighting. Stabbing. Probably being killed on the street. I'm built for that. . ."

    e.    *Desean Solomon's Connection to the Minneapolis Bloods*

Among other things, and in addition to the activities described above, a Cooperating Defendant will testify at trial that Desean Solomon is a member of the Bloods, who goes by the nickname "Black." Defendant Solomon's own statements and records confirm he uses the name "Black." For example, as referenced above, his JPay accounts (used to message Minnesota DOC inmates) are named "king black" and "sgyg yooo." Defendant Solomon also used the email address "KingB[####]@gmail.com" to open a JPay Account and a personal banking account with US Bank. Finally, in a May 15, 2021 recorded jail call with another member of the Bloods, the inmate said, "Black is a bitch." To which, Defendant Solomon responded, "watch your mouth." Photographs of Defendant Solomon, like the one below, also show his connection to the gang.



In this photograph, Defendant Solomon is depicted with his brother, a fellow Bloods member. He is wearing a shirt that says "woop" (a common phrase said between Bloods), where the "o" letters in the word are replaced with images of the "b" hand sign used by Bloods.

      f.   *Leontawan Lentez Holt's Connection to the Minneapolis Bloods*

Among other things, and in addition to the activities described above, a Cooperating Defendant will testify at trial that Desean Solomon is a member of the Bloods, who goes by the nicknames "Lil Blood," "Leon," "Shot Dog," and "Shotta YG." His own video, social media page, and bank card will be offered into evidence to corroborate his use of these nicknames. His own statements to law enforcement, and recorded communications with other members of the Bloods, further confirm his membership within the Minneapolis Bloods. For example, while in DOC custody on or about March 21, 2016, Defendant Holt

42

was fighting with another inmate. When questioned about the incident, he informed a DOC officer that the other inmate is a Black Disciple and he is a Blood, so they were not going to get along. Defendant Holt also has a tattoo of the "b" hand sign across his abdomen.

> g. *Michael Allen Burrell's Connection to the Minneapolis Bloods*

Among other things, and in addition to the activities described above, a Cooperating Defendant will testify at trial that Michael Allen Burrell is a member of the Bloods, who goes by the nicknames "Skitz" or "Big Skitz." Defendant Burrell's own correspondence signs off with "Big Skitz." In one letter written by Defendant Burrell, all the "c" words begin with a "b" and the replacement "b" is highlighted. Defendant Burrell also has a tattoo on his forearm that reads "Skitz" and a tattoo on his hand of the "b" hand sign.

## IV.  **EVIDENTIARY ISSUES.**

> a. *Stipulations and Self Authenticating Records under Fed. R. Evid. 902(11)*

The parties are currently conferring regarding proposed stipulations, including stipulations related to prior records of convictions and chain of custody testimony related to physical evidence from investigations referenced above in the "Enterprise" section of the United States' Summary of the Evidence. The parties anticipate they will provide an update for the Court at the pretrial conference scheduled August 8, 2024.

b.    *Summary Charts*

The government intends to present several summary charts to prove the content of voluminous documents that cannot be conveniently examined in court. Federal Rule of Evidence 1006 provides that a "proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." This Circuit recognizes that "[t]he use of summary charts, diagrams, and other visual aids is generally permissible in the sound discretion of the trial court." *United States v. Wainright*, 351 F.3d 816, 820 (8th Cir. 2003) (quoting *United States v. Preciado*, 336 F.3d 739, 745 (8th Cir. 2003)). Here, the summary charts detail the locations of each crime, cell site information from a phone number attributable to Defendant Solomon, and ballistics analysis from the two different murders alleged in the Indictment. Each of the charts is intended to aid the jury by summarizing, in a single comprehensible document or map, evidence that will be offered in documentary form and through both lay and expert witness testimony, but that would be difficult for the jury to comprehend in its "raw" form. The government disclosed most of the proposed summary charts in its disclosures (including the latest one disclosed with expert materials in May 2024), and the remainder will be provided on August 2, 2024 with the submission of the government's exhibits.

44

c.   *Transcripts*

The Government intends to play a transcript alongside a media exhibit consisting of the audio recording from the May 4, 2020 interview of Defendant Holt (if such statement is deemed admissible and/or permitted for use on cross-examination). The Government intends to play transcripts or partial transcripts alongside media exhibits marked Government Exhibits 2, 4, 6, 8, 10, 12, 14, 16, 18, 20, 22, 24, 26, 28, 30, and 32 that contain recorded jail calls placed by or placed to Defendants Holt, Solomon and Burrell (if such statements are deemed admissible and/or permitted for use on cross-examination). The Government finally intends to play transcripts alongside media exhibits marked Government Exhibits 34, 36, 38, 40, 42, and 44 that contain recorded jail calls placed by co-conspirator Robinson (the admissibility of these calls are addressed below in Government's Motion in Limine No. 2). The Government anticipates providing proposed transcripts to defense counsel in advance of trial with the goal of reaching agreement. *See United States v. Gonzalez*, 365 F.3d 656, 660 (8th Cir. 2004) ("[W]e believe that whenever the parties intend to introduce a transcript at trial, they should first try 'to produce an 'official' or 'stipulated' transcript, one which satisfies all sides").

    d.    *MIL No. 1: Admissibility of Uncharged 2019-2020 Acts of Violence, and Gun and Drug Possessions as Intrinsic*

The United States moves for an order ruling the overt acts described in Sections III(a)(1)(i) through III(a)(1)(v) of this Brief are intrinsic to the RICO Conspiracy and the Section 924(j) violations (each predicated on VICAR murder) charged in Counts 1 through 3 of the Indictment. This evidence will show the nature of the charged criminal enterprise (the "Minneapolis Bloods"), the pattern of racketeering required by the RICO Act and VICAR, and the defendants' knowledge of, agreement to, and participation in the affairs of the Minneapolis Bloods.

Courts have consistently found that evidence of uncharged acts is relevant in proving the elements of a RICO Conspiracy, and that its probative value exceeds any prejudice from its admission. *United States v. Henley*, 766 F.3d 893, 914–15 (8th Cir. 2014) (in RICO prosecution, evidence of uncharged violent acts, including murder of an off-duty corrections officer, properly admitted as "proof of enterprise, of the continuity of racketeering activity, and of the defendant's knowledge of, agreement to, and participation in the conspiracy"); *see also United States v. Palacios*, 677 F.3d 234, 245 (4th Cir. 2012.

1.   *Legal and Statutory Framework*

<u>Racketeer Influenced and Corrupt Organizations Act</u>. Congress enacted the RICO Act in 1970 within the Organized Crime Control Act of 1970—in part, to "to provide new weapons of unprecedented scope for an assault upon organized crime and its economic roots." *Russello v. United States*, 464 U.S. 16, 26-27 (1983); Pub. L. No. 91-452, 84 Stat. 941 (1970). Congress expressly directed that the RICO Act "shall be liberally construed to effectuate its remedial purposes," 84 Stat. 947, and courts have consistently heeded that instruction. *See, e.g.*, *Russello,* 464 U.S. at 26-27; *United State v. Turkette*, 452 U.S. 576, 587 (1981).

Defendant Solomon is charged with RICO conspiracy, under 18 U.S.C. § 1962(d), which makes it unlawful, *inter alia*, to violate § 1962(c).[12] To prove him guilty, the United States must prove: (1) an enterprise existed as alleged in the Indictment; (2) the enterprise had some effect on interstate commerce; (3) Defendant Solomon was associated with an enterprise; (2) two or more persons reached an agreement or came to an understanding to conduct or participate in the affairs of an enterprise, directly or indirectly, through a

---

[12] Section 1962(c) provides that: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

pattern of racketeering activity; and (5) Defendant Solomon voluntarily and intentionally joined in the agreement or understanding, and he specifically intended to otherwise participate in the affairs of the enterprise. *See* Eighth Circuit Model Criminal Jury Instructions § 6.18.1962B (2023 ed.).

No overt act is required to satisfy a RICO conspiracy, nor is the United States required to prove that Defendant Solomon agreed that he would be the one to commit any two predicate acts. *See Salinas v. United States*, 522 U.S. 52, 62–65 (1997); *see also United States v. Glecier*, 923 F.2d 496, 498-500 (7th Cir. 1991). It is not even necessary to prove that Defendant Solomon committed any substantive RICO violation as a result of the conspiracy. *See United States v. Randall*, 661 F.3d 1291, 1297 (10th Cir. 2011) (citing *United States v. Browne*, 505 F.3d 1229, 1263–64 (11th Cir. 2007) (noting that RICO conspiracy charges do not require proof of an overt act); *United States v. Corrado*, 286 F.3d 934, 937 (6th Cir.2002) ( "[Section] 1962(d) requires no 'overt or specific act' in carrying the RICO enterprise forward.").

The RICO statute defines racketeering activity by delineating certain crimes chargeable under state law and federal crimes indictable under listed federal statutes. 18 U.S.C. § 1961(1). A "pattern of racketeering activity" is defined as at least "two acts of racketeering activity, one of which occurred after [October 15, 1970] and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of

racketeering activity." 18 U.S.C. § 1961(5). "A 'pattern' is an 'arrangement or order of things or activity,'" but Congress "intended to take a flexible approach." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 238 (1989). At bottom, to establish a pattern of racketeering activity, the Government "must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *Id.* at 239 (emphasis in original).

Violent Crimes in Aid of Racketeering. The VICAR statute provides that "[w]hoever . . . for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity" engages in one of the predicate VICAR crimes "in violation of the laws of any State or the United States . . . shall be punished" as set out in the subparts of § 1959(a). 18 U.S.C. §1959(a). The VICAR statute has the same definition of "enterprise" and "racketeering activity" as RICO. *Compare* 18 U.S.C. § 1959(b)(2) *with* 18 U.S.C. § 1961(4); *see also* S. Rep. No. 98-225 at 307; *Concepcion*, 983 F.2d at 380.

To establish a VICAR violation, the Government must prove (as to each defendant at trial): (1) an enterprise existed as alleged in the indictment; (2) the enterprise was engaged in racketeering activity; (3) the enterprise was engaged in or its activities affected interstate commerce; (4) Defendant Solomon and/or Defendant Burrell (for Count Two) or defendant Solomon and/or defendant Holt (for Count Three), or another person aided and abetted

by the defendant, murdered the deceased; and (5) the defendant did so with the purpose of maintaining or increasing position in the enterprise.

### 2. *The Proposed Evidence is Intrinsic*

Uncharged predicate and overt acts are frequently admitted in RICO prosecutions as evidence of the conspiracy and nature of the enterprise charged. *See, e.g.*, *U.S. v. Baez*, 349 F.3d 90 (2d Cir. 2003) (uncharged robbery was conspiracy evidence); *United States v. Finestone*, 816 F.2d 583, 586 (11th Cir. 1987) (uncharged acts of kidnapping and murder); *United States v. Erwin*, 793 F.2d 656, 669 (5th Cir. 1986) (uncharged murder); *U.S. v. Hawkins*, 681 F.2d 1343 (11th Cir. 1982) (uncharged murder).

More specifically, the Eighth Circuit has held "[e]vidence of uncharged predicate acts of murder can be relevant to establish the elements of a RICO conspiracy." *Henley*, 766 F.3d at 915 (citing *Finestone*, 816 F.2d at 586–87). For example, in *Henley*, the defendants were members of the "Wheels of Soul" bicycle gang and the evidence received at trial included evidence of an execution-style murder of an off-duty corrections officer in retaliation for that officer having worn a rival gang's colors. *Id.* at 908. The Eighth Circuit concluded a cooperator's testimony about this murder was not unfairly prejudicial and was relevant to establish both the continuity of the conspiracy and the common purpose underlying a codefendant's acts. *Id.* at 908.

Here, the government anticipates based on prior communications with

counsel for defendants that at least part of the defense theory at trial will be to suggest no connection between the racketeering acts alleged in the indictment. The parties agree that it is the government's burden at trial to prove the relatedness of the charged racketeering acts. The decision in *Henley* provides additional guidance on this burden, relying on the Eighth Circuit's prior rulings in *United States v. Leisure.* 844 F.2d 1347 (8th Cir. 1988). In *Leisure*, the Court observed that "the continuous and consistent nature of the association . . .  as well as the sequence of murders and attempted murders committed by members of the group, distinguished that organization from one 'of a sporadic and temporary criminal alliance to commit one of the enumerated RICO crimes.'" 766 F.3d at 906 (quoting *Leisure.* 844 F.2d at 1363–64). Likewise, the uncharged acts discussed above are essential to establish not just the nature of the enterprise charged and defendants' knowledge, but to prove beyond a reasonable doubt that the two murders underlying the charged Section 924(j) violations are part of a pattern of racketeering, not isolated violent incidents. The defendants' sharing of firearms and prior acts of the enterprise and its members designed to assert the dominance of the Bloods or to keep opposition gang members or witnesses in fear of retaliation are squarely put at issue by the anticipated trial defense.

3.  *The Proposed Evidence is Not Unfairly Prejudicial*

The 2019 and 2020 uncharged acts are not unfairly prejudicial, especially in the context of the other two murders alleged in the Indictment. The first murder charged in the Indictment involves one or multiple codefendants firing at a non-Blood in the streets outside of an establishment where Bloods started altercations with opposition gang members. The most prejudicial 2019 acts the government proposes offering into evidence include the murder of ████████████ and the drive-by shooting of ████████████ (a pregnant single-mother at the time). The government does not intend to argue a codefendant was the triggerman for the ██████ homicide, and also offers to limit the amount of video to be offered in connection with the shooting of Ms. ████. *See*, *supra*, n.3. Since these acts are no more prejudicial than the ones enumerated in the Indictment, their admission does not run afoul of Rule 403. *E.g.*, *Baez*, 349 F.3d at 94.13

e.  *MIL No. 2: Admissibility of Jail Calls, Texts, and Social Media Communications as Statements of Co-Conspirators in Furtherance of the Conspiracy*

As discussed above, a RICO enterprise "must be marked by a common purpose." *Handeen v. Lemaire,* 112 F.3d 1339, 1351 (8th Cir. 1997). One such

---

[13] The United States also reserves its right to move for the admission of the Uncharged 2019-2020 Acts of Violence and Gun and Drug Possessions under Rule 404(b) and will notice the evidence as such alternatively by the deadline previously set by the Court.

purpose of the Minneapolis Bloods is the obstruction of law enforcement's detection of the enterprise's criminal activities. *See* ECF No. 1 at p. 6. The government intends to introduce evidence of multiple co-conspirator statements as acts evidencing this common purpose, including:

- The statements made by ████████████ in the video discussed above in Section III.b.4, and related social media posts where █████████ is naming witnesses from the discovery in his double-homicide Hennepin County trial;

- The letter from █████████████████, discussed above in Section Section III.b.4;

- Defendant Solomon's communications about utilizing help from "J Bird" to bribe a witness, discussed above in Section III.a.2;

- The March 2023 calls placed by ██████████, summarized above in Section III.b.4, discussing this investigation and his potential role as a witness within in; and

- Social media communications between members of the Bloods related to shootings, drug trafficking, and other affairs of the charged enterprise.

The government intends to call witnesses who may testify to statements made by the defendants or their co-conspirators during and in furtherance of the charged enterprise. These statements, which include JPay messages, jail calls, text messages, and social media communications; such evidence is admissible as co-conspirator statements under Rule 801(d)(2)(E).

Co-conspirator statements are admissible under Rule 801(d)(2)(E) when the government demonstrates, by a preponderance of the evidence, that (1) the

conspiracy existed, (2) the defendant and the declarant were members of the conspiracy, and (3) the statement was made during the course and in furtherance of the conspiracy. *United States v. Alcantar*, 271 F.3d 731, 739 (8th Cir. 2001); *United States v. Bell*, 573 F.2d 1040, 1043 (8th Cir. 1978).[14]

For the first and second elements, the Eighth Circuit has advised district courts to make an explicit finding on the record that evidence as to the existence of a conspiracy is sufficient to render admissible the statements of co-conspirators. *United States v. Macklin*, 573 F.2d 1046, 1049 (8th Cir. 1978). Accordingly, the United States will respectfully request such a ruling at the appropriate time during trial.

For the third element, the Eighth Circuit has interpreted the "in furtherance of" requirement broadly, finding statements to be in furtherance of a conspiracy if the overall effect of the conversation is to facilitate the conspiracy. *See Alcantar*, 271 F.3d at 739; *United States v. Edwards*, 994 F.2d 417, 422 (8th Cir. 1993). A statement is not hearsay and is admissible as a statement made by a co-conspirator if it advances the objectives of the conspiracy and does not merely inform the listener of the declarant's activities.

---

[14] In *Bell*, the Eighth Circuit established a procedure when a defendant objects to the admission of a co-conspirator statement under Fed. R. Evid. 801(d)(2)(E). A district court "may conditionally admit the hearsay statements of alleged co-conspirators, subject to a final ruling on the record that the statements are admissible pursuant to the co-conspirator exception to the hearsay rule." *United States v. Craig*, 94 F.4th 752, 756 (8th Cir. 2024) (internal citations omitted).

*See United States v. Snider*, 720 F.2d 985, 992 (8th Cir. 1983). Statements made to avoid law enforcement detection are in furtherance of a conspiracy. *See United States v. Cortez*, 557 F. App'x 596, 602 (8th Cir. 2014).

The admission of statements by a co-conspirator during, and in furtherance of, the charged conspiracy does not violate the Sixth Amendment's Confrontation Clause or *Bruton v. United States*, 391 U.S. 123 (1968). *See United States v. Singh*, 494 F.3d 653, 658 (8th Cir. 2007) (the district court admitted under Fed.R.Evid. 801(d)(2)(E) evidence regarding incriminating statements made by a non-testifying codefendant concerning how the charged drug conspiracy operated and individuals' roles within it); *United States v. Mickelson*, 378 F.3d 810, 819 (8th Cir. 2004) (the Sixth Amendment and *Bruton* are not implicated when the statements are those of a non-testifying co-conspirator and, therefore, admissible under Rule 801(d)(2)(E)). Moreover, it is well established that co-conspirators' statements made in furtherance of a conspiracy and admitted under Rule 801(d)(2)(E) are considered non-testimonial and, therefore, do not violate the Confrontation Clause as interpreted by the Supreme Court in *Crawford v. Washington*, 541 U.S. 36 (2004). *See Singh*, 494 F.3d at 659.

  f.  *MIL No. 3: To Preclude Reference to Self Defense in front of the Jury Until an Evidentiary Proffer is Made and the Court Rules Such Proffer is Sufficient Under Minnesota Law*

None of the defendants should be permitted to argue self-defense until they provide a proffer of the evidence they intend to raise for each element of self-defense. And if such a proffer, taken as true and in the light most favorable to that defendant, does not satisfy the burden of production on each element of self-defense, then the Court should preclude that defendant from arguing self-defense at trial.

  1.  *Legal Framework*

Count 2 charges Defendant Solomon and Defendant Burrell with using and carrying a firearm during and in relation to a crime of violence in violation of 18 U.S.C. §§ 924(c) and (j). The underlying crime of violence is VICAR murder, which itself is predicated on first-degree murder under Minnesota law. *See* ECF No. 1, Count 2. The same holds true for Count 3, which applies to Defendant Solomon and Defendant Holt.

On July 24, 2024, Defendant Holt gave notice that he would claim self-defense. ECF No. 243. Defendant Solomon and Defendant Burrell have yet to provide such notice.

Assuming an evidentiary showing is even possible, Minnesota law governing self-defense would apply to the predicate murders in this case. In a prosecution for murder in aid of racketeering, the predicate offense can come

from state law. *United States v. Mallory*, 104 F.4th 15, 18 (8th Cir. 2024) (cleaned up). "When it does, state law defines its parameters, including potential defenses." *Id.*

> ### 2. *Self-Defense is Unavailable to Defendant Holt as a Matter of Law.*

Self-defense is an affirmative defense to murder in Minnesota. Minn. Stat. § 609.065. Self-defense has four elements: (1) the absence of aggression or provocation on the part of the defendant; (2) the defendant actually and honestly believed that he was in imminent danger of death or great bodily harm; (3) reasonable grounds existed for that belief; and (4) a reasonable possibility of retreat to avoid the danger was unavailable. *State v. Devens,* 852 N.W.2d 255, 258 (Minn. 2014).

The defendant has the burden of going forward with evidence to support each element of a claim of self-defense. *Id.* at 629, 632. Once the defendant does so, the prosecution has the burden of disproving one or more self-defense elements beyond a reasonable doubt. *Id.* at 629. If the prosecution disproves even one element, self-defense is not available, as Minnesota law does not recognize imperfect self-defense. *State v. Thompson*, 544 N.W.2d 8, 13 (Minn. 1996). Defendant's burden of production must address all four elements of self-defense, or it fails and he may not avail himself of the defense at trial. *See State v. Graham*, 371 N.W.2d 204, 209 (Minn. 1985) (where one element of self-

defense was "not supported by any evidence", defendant failed to meet his burden and court's refusal to instruct on self-defense was proper); *Bellcourt v. State*, 390 N.W.2d 269, 272–73 (where defendant produced no evidence that he, the initial aggressor, clearly manifested his intention to withdraw, was not entitled to self-defense at trial).

At the time of this filing, only Defendant Holt has provided notice of self-defense. In his case, and as discussed above, elements 1 and 4 will be most at issue: absence of aggression and possibility of retreat. (This will also likely be the case if Defendant Solomon or Defendant Burrell attempt to invoke this defense with respect to the June 14, 2020 murder.) To avail himself of self-defense at trial, the initial aggressor must introduce *some* evidence that he "withdrew or retreated from the confrontation *and* successfully communicated this withdrawal." *State v. Gray*, 456 N.W.2d 251, 258 (Minn. 1990) (emphasis added).

This requirement to withdraw is stringent: "an aggressor has the duty to employ *all means* in his power to avert the necessity of killing, and before his right to self-defense may be revived, he must clearly manifest a good-faith intention to withdraw . . . and must remove *any* just apprehension or fear" in the victim. *State v. Bellcourt*, 390 N.W.2d 269, 272 (Minn. 1986). If there is no evidence of this good-faith withdrawal, a jury instruction on self-defense is inappropriate. *Gray*, 456 N.W.2d at 258.

58

Further, Minnesota law "requires that a person retreat if reasonably possible before acting in self-defense." *Devens*, 852 N.W.2d at 258 (citation omitted). "If a person is outside his or her home and can safely retreat, then the person's use of force is unreasonable as a matter of law." *Id.*

The video evidence will show Defendant Holt threw an unprovoked punch at ████, an opposition gang member convicted of stabbing a Bloods member in 2016. This punch set off a fight inside the bar between several members of the Bloods and others who supported ████, including his younger cousin, ████████. Holt then left the bar and retrieved at least two firearms from his nearby vehicle, before linking up again with his fellow Bloods members, and then passing one of the firearms to another Bloods member, a juvenile. As the group of Bloods circle back in the direction of the Pub, they pass ████ on the sidewalk, where shots were exchanged. ████ was struck by Holt's gunfire and died at the scene.

Holt personally initiated the violence at Williams Pub. Rather than de-escalate and withdraw, he escalated the violence by arming himself and another Blood and *returning* to the conflict. As noted above, Holt's actions and movements are captured on surveillance video, as is the shooting of ████ itself. Holt made absolutely no attempt to withdraw, much less to communicate that withdrawal. He also went to his vehicle, but instead of availing himself of a pristine opportunity to reasonably and safely drive away from any possible

threat, he instead armed himself and others, went *back* toward Williams Pub, and shot and killed ███. This video-recorded conduct forecloses Holt from claiming self-defense and precludes him from raising the theory during trial.

An initial aggressor who fails to make a good-faith attempt to withdraw and communicate that withdrawal cannot claim self-defense as a matter of law. Further, an individual who has a safe and reasonable avenue of retreat and fails to pursue it cannot claim self-defense as a matter of law. Therefore, it would be inappropriate to present this theory to a jury or to instruct on self-defense, and such an instruction would only confuse the jurors and open the door to a legally impermissible verdict.

> 3.  *A court may order a defendant to proffer evidence of self-defense and, based on that proffer, preclude the defendant from arguing self-defense at trial.*

Self-defense is a justification defense, not an excuse defense. *State v. Edwards*, 717 N.W.2d 405, 413 n.4 (Minn. 2006). The Eighth Circuit has "consistently permitted pre-trial determinations as to whether a particular defense is available"—including self-defense. *United States v. Davidson*, __ F.4th __, 2024 WL 3450138, at *2. In *Davidson*, the government moved in limine to preclude the defendant from arguing self-defense to the jury. *Id.* at *1. The trial court required the defendant to proffer on the issue of self-defense and, after hearing argument, barred the defendant from arguing self-defense. *Id.* The Eighth Circuit held that the district court "did not err in requiring

Davidson to provide a pre-trial proffer on the issue of self-defense." *Id.* at *2.

The court noted that "self-defense is different" from other affirmative defenses in that it only places a burden of production, not persuasion, on a defendant. *Id.* But in the end, that doesn't matter. A defendant can still be required to proffer before trial regarding an affirmative defense, and "when the defendant's evidence, even viewed in the light most favorable to him, is insufficient to sustain an instruction of self-defense even if believed, the trial court and jury need not be burdened with testimony supporting the defense." *Id.* (quoting *United States v. Bailey*, 444 U.S. 394, 416 (1980) (cleaned up)).[15]

Here, as in *Davidson*, any defendant wishing to claim self-defense at trial should be required to proffer the evidence supporting every element of self-defense. And if that proffer would not satisfy the burden of production, then the Court should bar that defendant from arguing self-defense at trial.

---

[15] As the district court explained, the pre-trial proffer benefits the defense, too. While the government "gains clarity" regarding what it must prove at trial, the defense "is able to begin trial with near certainty as to whether the jury will actually be instructed on self-defense. *United States v. Davidson*, No. 4:21-CR-00323-04-LPR, 2023 WL 3103889, at *8 (E.D. Ark. Apr. 26, 2023) (order granting motion in limine). "That's valuable to a defendant because self-defense arguments are essentially a point of no return," and a defendant would not want to be in the position of alleging self-defense in its opening and then be denied a jury instruction and unable to argue self-defense in closing. *Id.* "Indeed, the only possible benefit to a defendant in such a situation is one he can't have—the potential for jury nullification." *Id.*

g.    *MIL No. 4: YouTube Videos as Knowledge of the Enterprise and Defendant Holt's Membership within It[16]*

The three YouTube videos discussed above in Section III.a.1 feature Defendant Holt and are admissible as evidence of the existence of the charged enterprise and Defendant Holt's connection to it.[17] They are also admissible to help attribute two jail calls to Defendant Holt, wherein those calls he raps both about his biographical information and the Bloods' rule that speaking with law enforcement is "prohibited." At various times in each video, Defendant Holt displays hand signs that represent the Rollin' 30s Bloods, as well as gang signs meant to disrespect opposition gangs such as the 10z and the Lows. All three videos are also filmed, in part, in the same alleyway nearby the Square.

The Eighth Circuit has previously affirmed the admission of profane and violent rap recordings over a Rule 403 challenge where lyrics were probative of a defendant's participation in a narcotics conspiracy. *See United States v. Moore*, 639 F.3d 443, 447–48 (8th Cir. 2011) (reviewing for plain error in case where defendant failed to object at trial). Other circuits have also admitted rap videos or lyrics as enterprise evidence in RICO prosecutions. *See, e.g.*, *United States v. Herron*, 762 F. App'x 25, 30 (2d Cir. 2019) (multiple videos bragging

---

[16] The United States reserves its right to notice the rap videos referenced in this section under Rule 404(b) as an alternative theory in support of admissibility.

[17] Copies of these videos have been marked as Government's Exhibits 75, 76, and 77 and are being provided to the Court and defense counsel contemporaneous to this filing.

about past crimes and convictions and threatening rival gangs with violence were "plainly relevant" and not unfairly prejudicial); *United States v. Pierce*, 785 F.3d 832, 841 (2d Cir. 2015) (entire video admitted and sponsored by a cooperating witness).

For Defendant's Holt's song "Lil Message", Holt appears with several other known members and associates of the Bloods gang, including ███████████, Obuatawan Holt, and ███████████. ██████ participated in the murder of ████ at on April 23, 2022. The United States intends to introduce still frames of the video to show displays of gang signs (to be described by a Cooperating Defendant) and red clothing. The United State also intends to offer one six-second clip (from 0:48 to 0:54 of Government's Exhibit 75) in which Holt declares "I'm dropping 10z, fuck YNT / I hear them say I'm SUB / I'm not the Lows, I'm RTB." As he says this, Holt throws a gang sign known to display disrespect to northside opposition gangs. This segment of the video is filmed on the north side of Minneapolis, in opposition gang territory, a form of provocation to the opposition. In this section, Defendant Holt is disclaiming any affiliation with other Minneapolis-based criminal gangs (the "10z," "YNT," "SUB," and the "Lows"), and claiming "I'm RTB"—a common acronym for Rollin' 30s Bloods.



Top:         Defendant Holt in his YouTube video "Lil Message", displaying Bloods gang signs.
             Also pictured, displaying Bloods signs: Holt's brother ████████ (left, in red
             sweatshirt), and ████████ (right center, in white jacket). *See* GEX 75.
Bottom:      Obuatawan Holt, Defendant Holt's father, pictured in the same video. GEX 75.



The United States anticipates that it will introduce this video through a
Cooperating Defendant who appears in it. For the other two videos, wherein
Defendant Holt appears and does not rap, the government intends only offer
still images showing the colors, hand signs, and locations used.

h.    *MIL No. 5: Admissibility of Gang Tattoo Evidence*

The government intends to offer evidence that the Defendants have tattoos indicative of membership in the Minneapolis Bloods. The government further intends to offer evidence from cooperating witnesses who will identify tattoos that indicate membership and rank in the Bloods and will testify that non-gang members sporting such tattoos would be severely punished. This evidence is relevant and admissible because the government must prove that an enterprise existed, including evidence of its structure. Tattoos are relevant to establishing that element. *See United States v. Gaines,* 859 F.3d 1128, 1131 (8th Cir. 2017); *United States v. Lobo-Lopez*, 468 F. App'x 186, 192 (4th Cir. 2012) (unpublished). The government must also establish that Defendants were members of or associated with the charged enterprise, the the Minneapolis Bloods. Here, again, gang-related tattoos that specifically identify membership or rank are relevant to establishing that element. *See Gaines,* 859 F.3d at 1131 (gang tattoos establish membership); *United States v. Applins*, 637 F.3d 59, 77 (2d Cir. 2011) (same); *United States v. Rios*, 830 F.3d 403, 421 (6th Cir. 2016) (same); *United States v. Thomas*, 86 F.3d 647, 652 (7th Cir. 1996) (same); *cf. United States v. Toliver*, 387 F. App'x 406, 417 (4th Cir. 2010) (unpublished) (rejecting defendant's argument that compelled photographing of gang-related tattoos violated his Fifth Amendment privilege against self-incrimination because the tattoos are a physical trait, similar to voice or

65

handwriting). Thus, the gang-related tattoos are directly relevant to elements of the charged crime and therefore admissible. *See* Fed.R.Evid. 401, 402.

Because of the direct relevance of the tattoos, the admission of their existence—whether by photograph or by in-court demonstration—is not unfairly prejudicial. "*Unfair* prejudice under Rule 403 does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence." *United States v. Mohr*, 318 F.3d 613, 619-20 (4th Cir. 2003) (quoting 2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 404.21[3][b] (Joseph M. McLaughlin, ed., 2d ed. 2002) (emphasis in original). Rather, "Rule 403 only requires suppression of evidence that results in unfair prejudice—prejudice that damages an opponent for reasons other than its probative value, for instance, an appeal to emotion, and only when that unfair prejudice "substantially outweigh[s] the probative value of the evidence." *Id*. As found in *Toliver*, a defendant being made to display his tattoos in open court survives a 403 balancing test; the government does not intend to go nearly that far. The government's evidence will consist merely of photos of certain tattoos that clearly establish gang membership. Such evidence is admissible.

i.    *MIL No. 6: Admissibility of Testimony of Cooperating Co-Conspirator Plea Agreements*

The Government intends to call one or more Cooperating Defendants as witnesses in its case-in-chief. The government will elicit testimony from these Cooperating Defendants as to the terms of their plea agreements.

In the Eighth Circuit, the law is clear that "a confederate's guilty plea is admissible, even on the Government's direct examination of the witness, as evidence of the witness' [sic] credibility, or of his acknowledgment of participation in the offense." U*nited States v. Hutchings*, 751 F.2d 230, 237 (8th Cir. 1984) (emphasis added) (witness testified on direct examination about his plea of guilty to aiding and abetting defendant in crime with which defendant was charged), *cert. denied*, 474 U.S. 829 (1985). The witness's plea or evidence thereof, however, "cannot be used as substantive evidence of the defendant's guilt," and the jury should be so instructed.

j.    *MIL No. 7: Admissibility of Certified Records of Convictions for Predicate Acts of Charged Co-Conspirators*

The government intends to present evidence of Defendant Solomon's conviction for the June 14, 2020, murder of ███████ at the Broadway Pub and Grille, colloquially known as the 200 Club (Hennepin County file no. 27-CR-20-15534). This is alleged as an overt act and is evidence that Solomon agreed that the Minneapolis Bloods would engage in acts involving murder. The government also intends to present evidence of Defendant Burrell's

conviction for possession of a firearm at the same incident, for the same purposes as to Defendant Burrell (Hennepin County file no. 27-CR-21-393). Court records, in this case an official entry of conviction, are undoubtedly public records. The government is also in possession of a certified copy of this public record. The government plans to offer this certified copy of conviction while also proving, through witness testimony and physical evidence, that Solomon and Burrell committed these crimes.

This question has not been addressed in the 8th Circuit, but an overwhelming number of Circuit Courts have ruled it is permissible for the Government to introduce evidence of a defendant's prior convictions to establish the predicate acts in the current RICO conspiracy subject to the evidence being otherwise admissible pursuant to the Federal Rules of Evidence.

Prior convictions are routinely admitted into evidence at subsequent RICO trials, particularly as to crimes charged as RICO predicate acts. *See United States v. Pelullo,* 14 F.3d 881, 888 (3d Cir.1994) ("As an ordinary piece of evidence, a judgment is subject to evaluation by the fact finder, who can accept or reject such evidence as it deems appropriate."). Specifically, the Government may introduce evidence of prior convictions to establish the commission of predicate acts in a RICO prosecution. *See United States v. Tocco,* 200 F.3d 401, 417–18 (6th Cir.2000) (finding district court's

admission of evidence of co-defendants' prior convictions permissible to establish RICO predicates because the evidence was not used as collateral estoppel); *United States v. Gonzalez,* 921 F.2d 1530, 1535–39 (11th Cir.1991) (analyzing *Garrett v. United States,* 471 U.S. 773 (1985), and finding no violation of double jeopardy clause where prior convictions form the basis of RICO predicate acts in subsequent prosecution); *accord United States v. Scarpa,* 913 F.2d 993, 1013–14 (2d Cir. 1990) (citing *United States v. Persico,* 774 F.2d 30, 32 (2d Cir. 1985)); *United States v. Grayson,* 795 F.2d 278, 283 (3d Cir. 1986) (finding no violation of the Sixth Amendment double jeopardy clause where the Government admitted evidence of defendant's two prior convictions as predicate acts for the RICO substantive charge); *United States v. Pryba,* 680 F.Supp. 790, 792 (E.D.Va.1988), *aff'd,* 900 F.2d 748, 758 (4th Cir.), *cert. denied,* 498 U.S. 924 (1990); *United States v. Erwin,* 793 F.2d 656, 670 (5th Cir.), *cert. denied,* 479 U.S. 991 (1986).

The prior certified convictions are admissible under Federal Rules of Evidence 803(8) and 902(4). Rule 803(8) provides that a public record is not hearsay if the record sets forth the office's activities and, in a criminal case, "factual findings from a legally authorized investigation." Fed.R.Evid. 803(8). There can be no doubt that Solomon and Burrell's prior convictions are qualifying public records, and thus satisfy this standard and are not hearsay.

Rule 902(4) of the Federal Rules of Evidence states that "[e]xtrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to......[c]ertified copies of public records." This section provides that a "copy of an official record or report or entry therein, or of a document authorized by law to be recorded or filed and actually recorded or filed in a public office, including data compilations in any form, certified as correct by the custodian or other person authorized to make the certification," is self -authenticating. Courts have routinely admitted certified copies of prior convictions under this rule. *See, e.g.*, *United States v. McIntosh*, 200 F.3d 1168 (8th Cir. 2000); *United States v. Lechuga*, 975 F.2d 397, 399 (7th Cir 1992); *accord United States v. Aikins*, 946 F.2d 608, 614 (9th Cir. 1990); *see also United States v. Trice*, 621 F. App'x 151, 154 (4th Cir. 2015) (unpublished) (admitting certified conviction in Rule 404(b) context and noting that "the evidence was reliable, as it consisted of a copy of a certified judgment from a New Jersey state court").

The government does not, however, intend to rely solely on the prior certified conviction to prove Defendant Solomon's agreement that the charged enterprise would engage in the charged racketeering activity. The government will also introduce substantial amounts of witness testimony and physical evidence to establish that Solomon murdered █████████, consistent with

the approach outlined in *United States v. Tocco*, 200 F.3d 401, 417-18 (6th Cir

2000).

     k.    *MIL No. 8: Admissibility of Impeachment of Defendant Solomon*

     The United States also seeks to introduce evidence of the defendant's

following prior felony convictions for purposes of impeachment, pursuant to

Federal Rule of Evidence 609(a)(1)(B), if Defendant Solomon chooses to testify

at trial in this matter:

    1.    Murder in the second degree—drive-by shooting; riot in the first degree—resulting in death and armed with a weapon; and possessing ammunition or any firearm—conviction or adjudicated delinquent for a crime of violence, Hennepin County District Court, 27-CR-20-15534, convicted April 3, 2023.

    2.    Assault in the third degree—substantial bodily harm, Hennepin County District Court, 27-CR-18-21048, convicted March 7, 2019.

    3.    Bribery—offer, give, promise—witness—influence testimony, Hennepin County District Court, convicted July 22, 2014, sentenced to 365 days' jail with 80 days' credit.

     These convictions fall within Fed. R. Evid. 609's ten-year period, which

runs from the date of conviction or the date of release from confinement,

whichever is later. *See United States v. Stoltz*, 683 F.3d 934, 939 (8th Cir.

2012) ("the [ten-year] clock starts at the witness's release from any physical

confinement, or in the absence of confinement, the date of conviction"). Here,

the dates of Mr. Solomon's convictions in case numbers 27-CR-20-15534 and

27-CR-18-21048 occurred within the last ten years. Mr. Solomon's release from

jail on the bribery conviction on July 22, 2014, was also within the last ten years.

"Evidence of a criminal conviction for a crime . . . punishable by death or by imprisonment for more than one year . . . must be admitted in a criminal case in which the witness is a defendant, if the probative value of the evidence outweighs its prejudicial effect to that defendant."  Fed. R. Evid. 609(a)(1)(B).  "[P]rior convictions are highly probative of credibility 'because of the common sense proposition that one who has transgressed society's norms by committing a felony is less likely than most to be deterred from lying under oath.'"  *United States v. Collier*, 527 F.3d 695, 700 (8th Cir. 2008) (quoting *United States v. Chauncey*, 420 F.3d 864, 874 (8th Cir. 2005)).

If Mr. Solomon testifies, he will likely deny he committed the charged offense or was involved in the conspiracy—thereby putting his credibility directly at issue.  His prior convictions are probative of that credibility.  To mitigate any unfair prejudice, the government will not present the underlying facts of the convictions (with the exception of his prior bribery conviction, for the purposes set forth above in Section III.a.2).  The Eighth Circuit has confirmed that such cross-examination is more probative than prejudicial when credibility is a central issue.  *United States v. Crawford*, 130 F.3d 1321, 1323 (8th Cir. 1997) ("Credibility was at the heart of the jury's factfinding responsibility since possession was the critical issue.  The probative value of

the evidence was therefore significant . . . ."); *United States v. Brown*, 956 F.2d 782, 787 (8th Cir. 1992) (credibility is a "critical factor in the jury's choice" when the "jury essentially had to choose between one version of events presented by the government's witnesses and another version presented by the defendant's")..

l.    *MIL No. 9: Admissibility of Impeachment of Defendant Holt*

For the same reasons set forth above in MIL No. 8, if Defendant Holt chooses to testify at trial in this matter, the United States seeks to introduce evidence of his following prior felony convictions for purposes of impeachment:

1.    Possessing ammunition or any firearm—conviction or adjudicated delinquent for a crime of violence, Hennepin County District Court, 27-CR-19-24921, convicted July 2, 2020.

2.    Aggravated robbery in the first degree, Hennepin County District Court, 27-CR-16-2173, convicted January 20, 2016.

3.    Possessing a pistol/assault weapon—conviction or adjudicated delinquent for a crime of violence, Hennepin County District Court, convicted January 20, 2016.

m.    *MIL No. 10: Admissibility of Impeachment of Defendant Burrell*

For the same reasons set forth above in MIL No. 8, if Defendant Burrell chooses to testify at trial in this matter, the United States seeks to introduce evidence of his following prior felony convictions for purposes of impeachment:

1.    Possessing ammunition or any firearm—conviction or adjudicated delinquent for a crime of violence, Hennepin County District Court, 27-CR-21-393, convicted April 12, 2022.

2.   First degree drugs – possessing 25 grams or more of cocaine, heroin, or methamphetamine, Scott County District Court, 70-CR-16-3882, convicted March 10, 2017.

n.   *MIL No. 11: Unopposed Motion for Sequestration*

The Government has filed an Unopposed Motion for Sequestration following a meet and confer with counsel for Defendants.

o.   *Omnibus Motion Regarding Self-Serving Hearsay, Improper Character Evidence, References to Punishment, References to National or Local Controversied, or References to Discovery Issues. (MILs No. 12-19)*

The Government has also filed an omnibus motion in limine, also addressing several matters that are standard requests prior to jury trials. The Government rests on the points and authorities set forth in that filing in support of its Motions in Limine Nos. 12 through 19.

## V.   <u>WITNESSES</u>.

At this time, the government anticipates calling approximately 60 witnesses. Most of the government's witnesses will be law enforcement witnesses, with approximately 15-20 witnesses being lay witnesses (including any Cooperating Defendants).

The government also anticipates calling nine expert witnesses. The government will call BCA Forensic Scientist Andrea Feia, who will offer testimony regarding her analyses of the DNA swabs taken from the DCCs from the June 14, 2020, murder scene. MPD Forensic Scientist Andrew Debilzen

will testify regarding DCC-comparison and ballistics analyses related to the April 23, 2022, murder scene. MPD Forensic Scientist Aaron Zirzow will testify regarding firearms-, ballistics-, and DCC-comparison analyses related to the the June 14, 2020, murder scene, as well as the firearms and DCCs collected between in connection with December 2019 through May 2020 shootings and incidents described above. BCA Forensic Scientist Cooper Ashley regarding testing of narcotics seized during the controlled buys. FBI Special Agent Randy Larkin will testify regarding analysis of historical cell site location data from a cell phone attributable to Defendant Solomon. Hennepin County Medical Examiner ("HCME") Dr. Sarah Meyers will testify regarding cause and manner of the death of Rayshawn Brown. HCME Dr. Rebecca Wilcoxon will testify regarding cause and manner of the death of Marcus Banks. MPD Forensic Scientist Teryn Richsmann will testify regarding DCC comparison analyses from June 14, 2020, murder scene and fingerprint comparisons from the April 23, 2022, murder scene.

Dated:  July 26, 2024                    Respectfully Submitted,


ANDREW M. LUGER
United States Attorney

*s/ Esther Soria Mignanelli*
BY: ESTHER SORIA MIGNANELLI
BY: KRISTIAN WEIR
BY: CAMPBELL WARNER
Assistant U.S. Attorneys