UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 23-156 (SRN/TNL)

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) ) **GOVERNMENT'S SENTENCING MEMORANDUM** |
| (1) DESEAN JAMES SOLOMON | ) ) |
| Defendant. | ) ) |

The United States of America, by and through its attorneys, Lisa D. Kirkpatrick, Acting United States Attorney for the District of Minnesota, and Kristian Weir, Assistant United States Attorney, hereby submits the following sentencing memorandum.

The government respectfully requests that the Court sentence defendant Desean James Solomon to a term of life imprisonment. The government recognizes that this is an extraordinary request, and it is not one the government makes lightly. But here, it is deserved. Defendant Solomon murdered two people, with premeditation. He was a member of the brutal criminal street gang known as the Bloods, and he committed truly horrific crimes for the benefit of the gang. A sentence of life in prison is reasonable and appropriate.

## I. Introduction

Defendant Desean Solomon has spent his entire adult life committing violent crimes for and with the Bloods street gang. Solomon's career of violence culminated in his premeditated murders of two young men in just a two-year span. Desean Solomon's criminal actions ended the lives of two men forever, and his sentence should reflect the irrevocable loss he has inflicted.

The guidelines rightfully recommend a life sentence for any conviction for premeditated murder under 18 U.S.C. § 1962. Solomon is guilty of two. There is every reason to think that the evidence against Desean Solomon in this case—voluminous as it is—only scratches the surface of his violent criminal activity. Only a life sentence will properly incapacitate him and protect the public. Only a life sentence will be justice for the two victims. Only a life sentence will send a strong message of deterrence to the Bloods and other criminal street gangs that their reign of terror and violence will not be tolerated.

## II. The Bloods' Racketeering Conduct

The defendant stands convicted not only of two heinous, violent murders, but of his years of involvement in the Minneapolis Bloods criminal enterprise. The Court has now heard substantial evidence of the nefarious impact of the Bloods gang on the South Minneapolis community, from their large-scale trafficking of deadly narcotics to the regime of violence they enforced to

maintain their criminal territory. The defendant's sentence in this case must reflect the seriousness of the crimes committed by the Bloods gang and it must provide adequate deterrence to the entire enterprise.

### a. Indoctrination of children

The Bloods territory extends from Lake Street through the 30-block avenues of South Minneapolis. While the Bloods have wreaked havoc throughout the Minneapolis metro area, they have done the most damage to the community within their would-be kingdom. The impact of the Bloods gang within this community begins with their predation on its children. Bloods member William Blair testified that his tragic introduction to the Bloods gang occurred when he was just "10 or 11 years old," walking home from football practice. Jury Trial Transcript ("Trans.") at 228. As he walked home, the prepubescent William Blair unwittingly walked through a group of Bloods having "a meeting." *Id.* The adult Bloods members saw this as an insult and proceeded to beat the 10-year-old Blair. *Id.* at 229. Despite this cruel introduction, Mr. Blair returned and continued to hang around with the Bloods, because he wanted "to have friends and people to kick it with." *Id.* at 230. The Bloods preyed on a child's desire for acceptance, turning him into a violent enforcer who spent the next several decades attacking rival gang members and assaulting Bloods members who broke the rules. *Id.* at 265-269; Gov't's Exhibit 194, "William Blair Plea Agreement."

Echoes of Mr. Blair's sad indoctrination into a violent enterprise resound in fellow Bloods member Jamal Rice's personal history. Mr. Rice testified that he was introduced to the gang as an eight-year-old hanging out at the local Boys and Girls Club. Trans. at 1344. Mr. Rice went to the Boys and Girls Club to "play basketball, shoot pool and just do…homework." *Id.* at 1345. Instead, he encountered Bloods members and was drawn to them, as they "were making money and everybody liked them, so I wanted to be just like them. *Id.* at 1344. Mr. Rice testified that he continued to hang out with the Bloods and "claim it": effectively commit small crimes on behalf of the gang to let the members and the community know he wanted to associate with them. *Id.* at 1346. This included graffiti, fighting, and shooting at rival gang members. *Id.* Finally, after years of "claiming it," Mr. Rice was "jumped in" at age 17 when several Bloods members abruptly assaulted him as they were hanging out. *Id.* at 1348. This involved several older members beating Mr. Rice "as hard as they [could]" in order to determine if he had "heart." *Id.* at 1349.

Bloods member Jonathan Cade testified that he started committing crimes with Bloods members at around age 14, just from "mimicking what other people was doing (sic)." *Id.* at 1623. A common theme from each of the Bloods member who testified at trial was that as young children they wanted to be like the Bloods, to emulate them. The Bloods clearly follow an age-old marketing technique: targeting impressionable children. Their presence has

4

swept up untold numbers of South Minneapolis children for generations and will continue without adequate deterrence.

### b. Drug trafficking

All three members of the Bloods who testified for the government in this trial spoke about the wanton drug trafficking that the Bloods perpetuate within their territory. William Blair listed several corners where Bloods sold drugs in the decades he was in the gang. Trans. at 291. Jamal Rice testified that he sold drugs from the age of 18 to the day he was arrested on his current charge. *Id.* at 1356-57. Mr. Rice and Bloods member Andrew Noble sold fentanyl in broad daylight at George Floyd Square. *See*, *e.g.* Gov't's Exhibit 304. Jonathan Cade testified that he started selling drugs with Bloods members at age 14. Trans. at 1622-23. Like Mr. Rice, Mr. Cade sold fentanyl to an undercover informant in broad daylight at George Floyd Square. *See, e.g.,* Gov't's Exhibit 304. Mr. Cade acknowledged that he sold fentanyl daily in George Floyd Square from 2020 to 2022. Gov't's Exhibit 196 at 11. He estimated he sold over 25 kilograms of cocaine and nearly 1.5 kilograms of fentanyl in his years as a Bloods member. *Id.* at 13.

These were merely three members of the gang, and they were far from the only Bloods members were selling drugs daily throughout their territory over the decades the gang has held sway in South Minneapolis. Trans. at 291, 1756. For decades, the Bloods have made their money by flooding South

Minneapolis with a tidal wave of drugs, poisoning its residents for their own gain. A significant sentence is necessary in this case to protect the public and deter further criminal activity by the Bloods gang.

### c. Violence

To maintain their drug-fueled income, the Bloods must avoid competition and prosecution. They do this by constantly burnishing their reputation for violence. William Blair testified that he and other Bloods sold within their territory because they had "protection" in the form of "guns" and "other homies." Trans. at 290. Jonathan Cade testified that the mere presence of other Bloods within their territory made him "safer" selling drugs. *Id.* at 1756. Anyone with ill intentions would "know we Bloods, they know we tote guns, know we violent" so they would not "be too likely to try anything." *Id.* The Bloods' reputation for gun violence allows them to sell such a high volume of drugs at will within their territory. That is why the gang puts such an emphasis on members' willingness to fight with opposition gang members. Jonathan Cade described at least six different instances in which he shot at rival gang members and testified that he has been involved in "maybe 15 or more." Trans. at 1745; Gov't's Exhibit 196 at 11-12. He testified that these shootings involved firing upon rival gang members who were in Bloods territory to "get them up out the neighborhood," as well as going into rival gang territory looking for targets to shoot. *Id.* at 1742-1745. Jamal Rice, with more

experience in the gang, testified that he's seen Bloods shoot at rival gang members "[a]t least 50" times. *Id.* at 1354. This trial proved in great detail how the Bloods murdered rival gang members Marcus Banks and Rayshawn Brown.

 Lt. Adam Lepinski testified that this violence affects the entire South Minneapolis community. He spoke about the difficulty he had in his many years investigating crime in the neighborhood, how reticent witnesses were to come forward for fear of retaliation, how hard it could be to obtain justice for victims of the Bloods' violence. *Id.* at 1840-1841. Lt. Lepinski also spoke about his work with informants within the gang and how critical it was to protect their identities so that they would not face retaliation from within their own gang. *Id.* at 1833. William Blair confirmed Lt. Lepinski's experience when he said that Bloods members who speak to law enforcement or testify at trial face "death." *Id.* at 262. He spoke about a friend of his, "X," who was killed for suspected his suspected cooperation. *Id.* A Bloods member shot his car "about 20 times with his son in the back seat." *Id.* Jamal Rice and Jonathan Cade both confirmed that they understood that "snitching" to law enforcement would get a Bloods member killed. *Id.* at 1355 and 1728.

 The Bloods' drug trafficking empire within South Minneapolis rests on a foundation of threats and violence. Without this regime of retaliation and destruction, Bloods could not sell narcotics in broad daylight or intimidate

7

their community with such audacity. And this regime of violence is where the defendant made his substantial contributions to the enterprise. Only a sentence of life in prison can adequately address the harm done by the Bloods gang. Anything less will only embolden the Bloods to continue their decades of criminal activity without fear of proper consequence.

### III.   Defendant Solomon's Criminal History

William Blair testified about the different roles members of the Bloods take on as they enter the gang: shooter, drug seller, or both. Trans. at 236. When asked about Defendant Desean Solomon's role, he simply responded, "Shooter." *Id.* at 304. This is borne out by the ample evidence of the defendant's involvement in multiple shootings on behalf of the Bloods. His role in the gang was to ensure their reputation as a violent, dangerous criminal enterprise, and he fulfilled that role with brutal and tragic consequences.

His first criminal conviction came at age 18, when he held an ice cream shop employee at gunpoint while he and an associate robbed the store. PSR ¶ 67. An unrelated first-degree burglary charge was dismissed just before he committed this offense. PSR ¶ 79. After two probation violations while on supervision, Solomon and another Bloods gang member robbed another woman at gunpoint. PSR ¶ 68. After serving a prison term for that charge, Solomon was charged with theft of a motor vehicle in 2014, and recorded jail calls captured him arranging for his girlfriend to pay the victim to refuse to

cooperate with law enforcement. PSR ¶ 69. A few years later in July 2019, Solomon was convicted of assaulting a man in Minneapolis and knocking him unconscious. PSR ¶ 73. He accrued two additional probation violations while on supervision for that charge, and while on supervision, he was with fellow Blood Zachary Robinson at Augie's Nightclub on December 7, 2019 when Robinson shot another man and fled with Solomon in Solomon's car. PSR ¶ 82. The very next night, Solomon was again at Augie's Nightclub where he stalked Chanice Martin's SUV in his white Camaro, following the SUV through Minneapolis before shooting into it from his vehicle, causing life-threatening injuries to Martin. PSR ¶ 83. The gun used in this shooting was found in Bloods member Zachary Robinson's vehicle a few months later. Gov't's Exhibit 163. Months later, Solomon and other Bloods jumped a rival gang member in the bathroom of the Broadway Pub and Grille, which started a shootout outside the bar, punctuated by Solomon shooting and murdering Marcus Banks outside of the bar. PSR ¶ 29-30. Two years later, Solomon and other Bloods jumped another rival gang member at Williams Pub in Uptown Minneapolis that led to the murder of Rayshawn Brown just outside the bar. PSR ¶ 38-39.

  This summary is not meant to merely recite Defendant Solomon's criminal history. It illustrates a lifelong dedication to gang violence that has been entirely unaffected by years of supervision and incarceration. Solomon has never expressed remorse or concern for the victims left in the wake of his

sixteen years of violent crime. He has never shown any sign of leaving the life of gang violence to which he has been so dedicated. Even more concerning is that the robberies, assaults, shootings, and murders described above are only those crimes that law enforcement has the evidence to prove. This lengthy, blood-soaked criminal history almost certainly represents only a fraction of the violence Solomon has committed with and for his gang. The offenses introduced at trial, covering only a three-year period, perfectly illustrate Solomon's pattern of criminal activity.

### a. Chanice Martin

On December 8, 2019, Minneapolis Police Officer responded to the occupants of an SUV who were in obvious distress. Gov't's Exhibit 135, "Excerpt of Officer Ryan Atkinson Body-Worn Camera Footage." The passenger, Chanice Martin, had suffered a gunshot wound to her torso and the driver of the vehicle was shouting that the shooter had been in a "white Camaro." *Id.* Ominous surveillance footage showed Chanice Martin's SUV had been followed for over a mile through downtown Minneapolis by a white Chevrolet Camaro after leaving Augie's Nightclub. *See, e.g.* Gov't Exhibit 137, "Excerpt Minneapolis Public Housing Authority Video from December 8, 2019.

Defendant Desean Solomon had been stopped driving that same white Camaro in December 2018 with a .40 caliber Glock handgun under the driver's seat. Gov't's Exhibit 102, "Excerpt of Officer Nicholas Englund's Body-Worn

10

Camera." The .45 caliber Springfield pistol used to shoot Chanice Martin was found five months after the shooting in a search of Bloods member Zachary Robinson's car. Gov't's Exhibit 163, "Photographs of Robinson's Vehicle with Pistol." This firearm was also used in an April 2020 shooting of an occupied BMW sedan near the center of Bloods rival 10z/20z territory.

This incident was part of two shootings near Augies just 24 hours apart that involved Solomon and Robinson. The admirable effort of Officer Atkinson to save Chanice Martin's life is the sole reason Desean Solomon is not responsible for a third murder.

### b. Franklin Avenue Shooting

On April 27, 2020, a black Chevrolet Tahoe fired multiple shots in broad daylight at a blue BMW sedan near Franklin Avenue in South Minneapolis. Much like the Chanice Martin Shooting, the black Tahoe saw the blue BMW and began following it through the Minneapolis streets. Gov't's Exhibit 150. The .45 caliber discharged cartridge casings found at the scene were a match to those found in the Chanice Martin shooting, and were eventually matched by forensic scientist Aaron Zirzow to the Springfield XD pistol found in Zachary Robinson's car just 15 days after this shooting. Trans. at 1599.

Just five days later on May 2, 2020, the defendant and co-defendant Leontawan Holt were found together in that same black Tahoe. Gov't's Exhibit

157. Inside that Tahoe, officers found a 9mm FN Herstal pistol that was fired at the blue BMW. Trans. at 1599.

Desean Solomon was found in two vehicles used to track and attack two different victims just four months apart. He was found in possession of one of the firearms used in those shootings, and Zachary Robinson—frequent collaborator in Desean Solomon's acts of violence—was found with the other. Then, a month after he was found in the black Tahoe with a gun used in a shooting, Desean Solomon murdered Marcus Banks.

### c. Marcus Banks

On June 14, 2020, Defendant Solomon and a group of Bloods set off a gunfight outside a crowded bar that led to the murder of Marcus Banks. Solomon, along with Zachary Robinson and co-defendant Michael Burrell, began by assaulting rival gang member Isaac Hodge in the bathroom of the Broadway Pub and Grille. Gov't Exhibit 223; Testimony of Jonathan Cade, Trans. at 1631-1632. This led to over 100 shots being fired outside the bar as many people milled about, entirely unaware. Gov't Exhibit 223; Testimony of Sgt. James Jensen, Trans. at 915. Solomon knew a firefight was imminent and warned several friends to leave the bar, as he conspicuously fondled a high-capacity handgun in his front sweatshirt pocket. Gov't Exhibit 223.. As co-defendant Burrell started shooting at Isaac Hodge outside the bar, Defendant Solomon and Zachary Robinson pulled out firearms and began firing

12

indiscriminately down Broadway. Gov't's Exhibit 223. Defendant Solomon then fired several rounds into the back of the car carrying rival gang member Marcus Banks, murdering him with a bullet through the head. The gunfight left at least one bystander, Telecia Blackwell, with a gunshot wound. Gov't's Exhibit 231.

### d. Rayshawn Brown

On April 23, 2022, Defendant Solomon again instigated a fight that led to a shootout outside of a crowded bar, this time in the Uptown neighborhood of Minneapolis. Solomon and co-defendant Leontawan Holt, along with a juvenile Bloods member, started an unprovoked fight with Crips gang member Jesse Walker, who had stabbed a Bloods member. Gov't's Exhibit 401. Defendant Solomon then left the bar and led a group of Bloods up the street as co-defendant Holt and the juvenile Blood armed themselves with handguns. Gov't's Exhibits 414 and 416. The group encountered Walker's cousin, fellow Crips member Rayshawn Brown, and Holt murdered Brown with Solomon nearby.

In sum, Desean Solomon was convicted of the premeditated murder of one Bloods rival, and aiding and abetting the premeditated murder of another. The Court has seen clear evidence that he was involved in two other shootings in the six months leading up to the murder of Marcus Banks. Every one of these shootings occurred in public places, often surrounded with bystanders.

It is astonishing that only one bystander was wounded by Solomon's reckless spree of violence. Every single one of Solomon's acts of violence put countless innocent lives at risk, and this chain of violent acts was only broken by his incarceration. The government's request for a life sentence is not made lightly. It reflects the profound seriousness of Solomon's two murder convictions as well as his history of violence within the Bloods gang. It is made with the lives of Defendant Solomon's two murder victims, Marcus Banks and Rayshawn Brown, firmly in mind.

It also takes into account the need to deter Defendant Solomon from future criminal acts, and it is clear that incarceration is the only means of doing so. Just as disturbing as the wanton nature of Solomon's violence is his lack of remorse. His refusal to cooperate in any way with the presentence investigation is emblematic of his regard for his victims and his crimes. PSR ¶ 88. The sentence in this case must address the substantial need to specifically deter Defendant Solomon from future acts of violence. His criminal history dates back over a decade and runs the full gamut of racketeering offenses, from robbery to witness tampering to shootings. PSR paras. 67-72. The defendant has served multiple terms of incarceration, beginning when he was 18. PSR ¶ 67. These sentences have proved to be no impediment whatsoever to his continued criminal activity. Likewise, Defendant Solomon has been on supervision almost continuously dating back to 2008, and it has utterly failed

to affect his conduct. Only incarceration will appropriately deter Defendant Solomon from future acts of violence.

Solomon also stands convicted of RICO conspiracy, a charge which put the entire Bloods enterprise on trial. This sentence must also account for the need to deter other Bloods members from future violent, dangerous conduct. The Court has now heard weeks of evidence about the nature of the Bloods and the damage they caused in the wake George Floyd's death. When MPD was forced from George Floyd Square, the Bloods moved in and took advantage of a reeling community, doing more harm to the already vulnerable. This sentence must send a clear message of deterrence to any remaining Bloods members about what consequence they face if they insist on pursuing their violent ends.

## IV.   Conclusion

The government respectfully requests that the Court sentence Desean James Solomon to a term of life imprisonment, plus 240 consecutive months' imprisonment, as recommended in the presentence report. PSR ¶ 106. Only a term of life imprisonment can provide just punishment for the callous murder of two men. It is the only sentence that can properly protect the public from Desean Solomon's lifelong dedication to violence. It is, after sixteen years of half-measures, the only way to deter him from further violence. And it is the

only sentence that may deter the Minneapolis Bloods from doing greater damage to a community that has suffered long enough.

Dated: May 14, 2025             Respectfully submitted,

                                LISA D. KIRKPATRICK
                                Acting United States Attorney


                                *s/Kristian Weir*
                                KRISTIAN WEIR
                                CAMPBELL WARNER
                                Assistant U.S. Attorneys